Rickey D. NEWMAN *v.* STATE of Arkansas

CR 02-811 106 S.W.3d 438

Supreme Court of Arkansas
Opinion delivered May 22, 2003

*Linda Scribner*, for appellant.

*Mike Bebee*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

Robert L. Brown, Justice. This case represents the first automatic appeal and mandatory review of a death sentence pursuant to Ark. R. App. P.—Crim. 10. In this opinion, this court has reviewed the issues required by Rule 10 as well as issues raised by appointed counsel for appellant Rickey Newman and issues raised by this court on its own behalf. We find no reversible error, and we affirm the conviction for capital murder and the sentence of death.

On February 15, 2001, Benny Billy, a transient, notified the Van Buren Police Department that he had found a body in the Lee Creek Park area. Upon arrival, Van Buren police officers found the decomposed body of Marie Cholette, a forty-six-year-old female transient, in a make-shift tent composed of tarps and scrap lumber. Cholette had been mutilated. Her neck had been slit, and her torso had been sliced from the neck down to her pelvic area.

In the course of the investigation, the police officers questioned the appellant, Ricky Newman, also a transient and a "rail rider." This occurred on February 15, 2001. Newman was unable to identify a photo of Cholette positively, but he told police officers that he had met a female by the name of "Hardhead" or "Hardhat" at the rescue mission in Van Buren. He stated that he and the woman had walked to a camp where the railroad tracks made a "T." There, they met three people named Psycho, Snake, and Copper. He stated that everyone was "huffing" except for himself and that Psycho began talking about human sacrifice which scared him.[1] Newman said he left and walked back to a friend's house. At trial, Officer Brent Grill, who conducted the interview, testified that Newman was "loud spoken" and that he kept his arms crossed while leaning back in his chair. During the evening of February 15, 2001, the police officers collected hair and blood samples from Newman, as they had done from the other suspects.

After investigating Newman's initial story, the police officers were unable to locate individuals named Psycho or Snake. They did learn that an individual named Copper had left town around February 5, 2001. As for Newman, the police officers discovered that he had actually gone to the home of his uncle, Dub Ross.

---

[1] By "huffing," it was understood that they were inhaling an intoxicant such as glue, turpentine, paint, or gasoline.

Video surveillance from Shamrock Liquors in Fort Smith revealed that Newman and Cholette had been in the store on February 7, 2001, and had purchased two bottles of wine and cigarettes.

On March 2, 2001, the police officers learned that Newman intended to leave town. Because of this, they asked him to come to the Van Buren Police station for another interview. When he arrived, Newman was advised of his *Miranda* rights, and he signed a *Miranda* waiver form. Officer Brent Grill testified at trial that Newman's demeanor during the ensuing interview was different from that of his previous interview. This time, he seemed to Officer Grill to be very stressed, to have blood-shot eyes, and to be soft spoken. When questioned, he told police officers that he did not remember going to Shamrock Liquors with Cholette and that he had traded the jacket he was wearing that day at the rescue mission. Newman told the police officers that he killed Cholette, and he asked if he could write out a statement. In that statement, Newman stated that at home he was known as Rickey Newman and Renegade "on the track." He wrote that he becomes "Seaco" when he blacks out and that he cannot control Seaco. He told police officers that when he becomes "Seaco," he will kill "anyone he see[s] as a threat" and confessed that he was "guilb [sic] of all this."

Following his statement, Officer Mik Molnar joined Officer Grill in interrogating Newman. Newman claimed that he was getting a headache and told the police officers that "he stabbed her" and that it was all in the statement. He then proceeded to write more on a second piece of paper. In that statement, Newman wrote "Please lock me up Do not push me I hate Scaio Lock me up please." He further wrote: "Help me kill him are kill Rickey Newman all I can remdermed is Scaio came out and kill that helpless Lady[.]" Newman then told the police officers that he was really stressed, that he had a headache, and that he did not want to talk anymore. He asked the police officers to lock him in a cell by himself so he would not hurt anyone else. That same day, Newman was arrested, and a search warrant was issued and executed on his mother's home to obtain his clothing.

On March 27, 2001, Newman was arraigned. At the arraignment, he attempted to waive all of his rights and to plead guilty to the charges against him. The circuit court refused the

guilty plea and appointed the office of the public defender to represent him. During April 2001, Newman sent several letters to the police investigators in which he admitted killing Cholette. In May, June, and July 2001, Newman mailed several letters to the circuit court in which he at times requested the death penalty and denied any need for a mental examination and at other times requested an immediate jury trial. He also requested any material from the State that would be used as evidence against him at trial.

On May 9, 2001, the circuit court held an inquiry hearing.[2] At that hearing, Newman informed the circuit court that he had fired the public defender, Robert Marquette. The court informed Newman that if he were to represent himself as he had expressed a desire to do, he would be bound by the rules of evidence and that the likelihood of being convicted was much greater, as was the likelihood of receiving a more severe punishment. Over Newman's objection, the court decided to leave Mr. Marquette as standby counsel and permitted Newman to represent himself, with Mr. Marquette available should Newman need to ask him anything about the law. The circuit court inquired about whether Newman had been evaluated by the Arkansas State Hospital, and Newman's standby counsel informed the court that Newman was on the waiting list.

On March 27, 2002, a hearing on Newman's motion for production of various material and information was conducted by the circuit court. At that time, the court supervised the State's delivery of materials and information from the State Crime Lab to Newman. The court then admonished Newman that he should not represent himself. The court further ordered the prosecutor to make known to Newman which, if any, admissions or statements Newman had made, including letters to the prosecutor, that the State intended to use against him. Newman inquired as to whether the State would be seeking the death penalty against him, and the prosecutor responded that death was one of the potential penalties in the case.

---

2 The record dates Newman's inquiry hearing as occurring on May 9, 2002. However, the sequencing of the record suggests that the hearing actually occurred on May 9, 2001. The docket sheet coincides with this sequencing and reflects that the inquiry hearing took place on May 9, 2001.

On April 8, 2002, the circuit court held a second inquiry hearing. At that time, Newman informed the court that Mr. Marquette was going to handle his trial and that he (Newman) would address the jury at some point during the trial. On June 5, 2002, the circuit court conducted Newman's omnibus hearing. At that time, Newman presented testimony from Dr. Charles Mallory, a psychologist with the Arkansas State Hospital, who stated that he had examined Newman and did not find any signs or symptoms of multiple personality disorder. Dr. Mallory further testified that Newman exhibited no symptoms of mental disease, as defined by Arkansas law, but that a polysubstance abuse history and a history of personality disorder were found. Dr. Mallory also stated that a person who is rational and competent to stand trial could still have a deep and abiding conviction that he must pay for his crime. The doctor stated that Newman was competent to stand trial and was rational enough to make decisions regarding what he wanted to do with regard to his case.

The circuit court found that Newman was competent to stand trial. Mr. Marquette next proceeded to withdraw, at Newman's request and instruction, virtually every motion that had been filed on his behalf.[3] Newman confirmed to the circuit court

---

[3] Specifically, Mr. Marquette withdrew the following motions: (1) motion to quash the information on the grounds statutory aggravating circumstances are vague and overbroad and have not been narrowly construed by the appellate court; (2) motion to prohibit introduction of aggravating circumstances; (3) motion to apply heightened standard of review and care in this case due to the State seeking the death penalty; (4) motion to prevent covert or overt elicitation of information, evidence, or statements from defendant; (5) motion to allow individual sequestered *voir dire*; (6) motion to suppress documents; and (7) any motion to suppress any other statements.

Mr. Marquette noted that the following motions were not withdrawn to the extent that the State had either complied with the motion or had no objection thereto, or would comply in the future, or that the court would address at the proper time: (1) motion for discovery and disclosure of exculpatory evidence pertaining to victim impact evidence; (2) motion to require the State to reveal any information about any prosecution witness that could conceivably influence his testimony; (3) motion for full recordation and transcription of all proceedings in their entirety; (4) motion to prohibit jury dispersal and to prohibit jury's exposure to victim's friends or family; (5) motion to compel disclosure of aggravating circumstance and information relating to mitigating circumstances; (6) motion to allow an opening statement during the penalty phase; (7) motion to omit from submission to the jury any aggravating circumstances completely unsupported by the evidence; (8) motion to allow the admission of mitigating and expert evidence; (9) motion for production of alleged section 404(b) evidence; (10) formal notice of right to cross examination; (11) motion for

that he was in agreement with Mr. Marquette's actions. The circuit court did deny two of Newman's motions: (1) motion to quash information on grounds that the death penalty is a cruel and unusual punishment violative of the Eighth Amendment to the United States Constitution; and (2) motion to prohibit death qualification of the jury. The court set Newman's case for trial.

Newman's jury trial took one day, and occurred on June 10, 2002. At the trial, he waived his right to appear in street clothes and instead asserted that he would rather be tried in his orange jail togs and remain shackled. When informed by the circuit court of his right to be unshackled and to wear street clothes, Newman replied: "Sir, it doesn't matter what I'm wearing, I'm guilty, I killed the lady period." The prosecutor then stated that he wanted to conduct *voir dire* individually, which the court permitted. Newman further waived imposition of Arkansas Rule of Evidence 615 regarding the exclusion of witnesses from the courtroom.

Following *voir dire*, the prosecutor began his case by calling several police officers who testified to the events of their investigation into Cholette's death. The prosecutor also introduced a videotape of the crime scene as well as several still photographs of the crime scene taken by police officers. Dr. Frank Peretti, an associate medical examiner, next testified that Cholette's body was the worst mutilation of a body he had seen during his last ten years as a medical examiner in Arkansas. He testified that Cholette suffered an eight-and-a-quarter inch by one-and-one-half inch slicing wound around her neck, which occurred while she was still alive. Additionally, both of her nipples had been cut off, with the right nipple being cut off post-mortem. She also suffered a stab wound to the left lung that was three-and-one-half inches wide, while next to it was another stab wound which terminated in the left lung measuring up to six inches deep and sustained while she was still alive. Dr. Peretti stated that the worst injury suffered by Cholette was a large, gaping wound sustained from the sternum down to her pelvic bone. All of her intestines were protruding and half of her liver had been cut out. Additionally, part of her vagina had been removed while she was still alive, and she had sustained injuries to the anal area. He testified that Cholette had multiple contusions, indicating that she had

discovery; (12) motion to compel; and (13) motion to permit viewing of tapes and recorded interviews.

fought her attacker. He added that toxicology results demonstrated that she had a small amount of alcohol in her, as well as "therapeutic concentrations [of] Amitriptlyne and its metabolite Noritriptylne therapeutic." Several photographs taken by Dr. Peretti were introduced into evidence in connection with his testimony.

Chantelle Bequette, a criminalist with the State Crime Lab, testified that hairs microscopically similar to Cholette's were found on Newman's sweatpants, gloves, and boots. She further testified that in examining vacuum samples taken from a sleeping bag and purple comforter found at the crime scene, she found one head hair that was microscopically similar to Newman's.

Officer Brent Grill testified for the State about Newman's interviews and subsequent confessions. Officer David Cate also testified and told the jury that on March 7, 2001, when Newman left the courtroom following his plea hearing, Newman said: "I killed the bitch, I don't know why in the world they won't let me plead guilty."

Detective Steve Weaver next testified that on May 9, 2002, Newman called from the detention center wanting to talk to either Officer Grill or to him. He went to the detention center to visit with Newman, and Newman told him that the murder weapon was a "pocketknife with a blade about five inches long on it" and that he had hidden it and his shirt in a shed down by the rescue mission. Detective Weaver went to the location where Newman claimed the weapon could be found but discovered that the property had been razed following Newman's arrest. Newman then proceeded to describe to Detective Weaver the events of Cholette's death, which the detective recited to the jury:

> [H]e started describing the killing, in his words, it was a sacrifice to the devil. And he said that the victim, Marie Cholette, was a fake, referring to the — it's a group called the freight train riders of America, it's kind of a street gang style, the rail riders have, and they have different groups that are characterized by their colors, such as red or black, and he said that she was a fake, saying that she was an FTRA black and that that was the reason he had killed. And he said that the reason he could tell is they all wear their rags, which is a bandanna [sic] style thing, they can have 'em on their neck and they've got what's a concha, right up here by their neck where they can tie their bandannas down with, and he said the

> concha that she had on was not real, and that a true FTRA would have a real concha on. And he said the one she had was tin.

> . . . .

> He said—he said it's not right that she was a fake like that, so he said that he left out, had her go up on the bluff with him, he said he took her up there telling her—because they had the alcohol and such, and they was gonna go up there to drink, and he said that he had—the intent whenever he took her up there was to kill her.

> . . . .

> He said that he went down to the river and washed his hands and then he went down to the house that he had told me about the shed, he put his shirt and also that knife up in the rafters.

Newman's defense counsel later moved to strike Detective Weaver's testimony following the conclusion of the State's case-in-chief. He did so on the basis that at the time the detective spoke with Newman, he was represented by counsel. The court ruled:

> . . . based on all the circumstances, I do think — I do think that Mr. Marquette's in fact this office did represent Mr. Newman, I think you're finding this affidavit and leading the State to think that Mr. Newman did — I can understand how this happened. I'm going to overrule your objection and not strike it, let's move along.

The prosecutor next called Dr. Charles Mallory. He testified that he found Newman "fit to proceed" and that Newman suffered from polysubstance abuse and personality disorder. He further stated that although Newman showed variable moods and was angry and threatening at times, those were characteristics that were understandable under his personality diagnosis and did not reflect any indication of multiple personalities. Dr. Mallory's conclusion was that Newman could appreciate the criminality of his conduct and what he was accused of doing.

The State rested. At that time, Newman's counsel motioned for a directed verdict on the basis that "the State ha[d] not proven all the elements of capital murder beyond a reasonable doubt." He asserted that the testimony did not reflect all the elements. The circuit court overruled Newman's motion. Newman also renewed his only two remaining motions: that the death penalty is unconstitutional, and that the sentencing provisions of the capital murder statute were unconstitutional. Those motions were also overruled by the circuit court.

The court inquired of Newman, outside the presence of the jury, whether he wished to take the stand, as indicated by Mr. Marquette. Newman stated that he did and proceeded to testify. He informed the jury that he had lied when he told the police officers about Snake and provided his own recitation of the events leading up to Cholette's death and the murder itself:

> What happened, uh, I came into town, I met up with this lady, she was wearing a black rag and a tin concha, she was a fake. She claimed that she hurt one of our brothers during a little alteration [sic] with her and her husband, uh, I went across the bridge and I bought her alcohol, I drugged her up, I got her drunk and I killed her. Cut her from head to toe. I killed her more than once, I killed her until I got tired of killing her, until the passion of blood went away. Then I left it lay like a dog and walked away. Washed my hands of the whole affair.

Newman added that he had lied when he told the police that Psycho killed Cholette. He stated that according to the experts there was no Psycho, but that he knew he had a rage inside of him and that he was capable of "hurting real bad," and that he had had headaches for the last nine or ten years. He concluded his testimony with this statement:

> Well, the truth is the only justice in this case is the death penalty, and as ladies and gentlemen of the jury you got to think that could have been you, your daughter, uh, anybody you might know, it just had to be somebody, it happened to be somebody claiming—claimed she was who she wasn't. I don't know, you's probably don't understand gang activity, but we got our own turf we got to protect, garbage's got to be taken out at all costs, that's—if you want to ask a few questions I'll tell you, I don't know how—I don't know how to tell ya' I'm guilty, I'm guilty I did [it] period. . . .

On cross-examination by the prosecutor, Newman confirmed that he had been convicted of battery in 1998. He further conceded that he had written letters to the prosecutor, the circuit court, and Detective Weaver and Officer Grill. He again admitted that he was not denying the State's allegations and that Cholette had gotten what she deserved. He detailed the events of the murder, saying that he cut Cholette's throat, burned her, and stabbed her eyes out so "she couldn't find Heaven or Hell."

Newman also called Terry Rea, the jail administrator for the Crawford County Sheriff's Department, in his defense. Rea testified that there had been no problems with Newman in his jail cell, but that several other inmates were scared of him. Following Rea's testimony, Newman rested. He renewed his motions, which the circuit court denied.

The circuit court instructed the jury on Capital Murder, Murder in the First Degree, and Manslaughter. During the prosecutor's closing argument, Newman became disruptive, and the circuit court ordered him gagged. Approximately four hours after retiring to deliberate, the jury returned a verdict of guilty as to the capital-murder charge.

During the penalty phase, the prosecutor presented evidence that Newman had been convicted of battery in 1998. Newman presented no mitigating evidence in his defense. Instead, he addressed the jury:

> I, Ricky Newman, freely tell the jury that I killed the lady in cold blood. I first cut her a little at a time to make it hurt and then I stabbed her for fun and to watch her bleed. Then I cut her from her neck to her groin, and then I took some her insides out and cooked some of her organs to see how long they would cook.
>
> Let's see—take to cook—how long it takes to cook them. I enjoyed murdering her very much and I had a lot of fun killing her and making her hurt real bad.
>
> This tells you that I am guilty of murder. The first time I saw her I knew I was going to kill her and make her hurt real bad with a lot of pain. Her family needs a little peace and comfort in their lives, and the only peace and comfort her family will ever have is to put the one that killed their loved one to death. . . .
>
> . . . .
>
> The only verdict that will serve this horrible crime in the mutilation of the lady I killed—for the lady's peace, is for her killer to be put to death in this case. I know the jury will come back with the right decision. —And the decision is yours, jury, and only the jury's I am—I am myself asking for the death penalty and ask for punishment in this capital murder case.
>
> . . . .

I will not appeal on the right verdict of death, the only decision there is to come back with, and I will ask for a fast execution day.

Thank you, ladies and gentlemen of the jury, I know you will not—I know you will do the right thing for her family, and the taxpayers and yourself, the right justice for all is death, come back with the right decision. Respectfully, Ricky Newman, stone-cold killer. Thank you ladies and gentlemen.

After deliberating for less than one hour, the jury returned a verdict of death. On June 10, 2002, the circuit court entered Newman's judgment and commitment order.

Pursuant to this court's Rule of Appellate Procedure—Criminal 10, the Crawford County Circuit Clerk filed a notice of appeal on Newman's behalf on June 14, 2002. On August 5, 2002, a partial record was lodged with the Supreme Court Clerk.[4] On August 20, 2002, this court entered a stay of Newman's execution. On September 12, 2002, this court denied Newman's *pro se* motion to waive the appeal of the judgment and sentence so that the death sentence could be carried out immediately. *See Newman v. State*, 350 Ark. 51, 84 S.W.3d 443 (2002) (*per curiam*). We further rejected the State's contention that a competency hearing was required following Newman's waiver of his personal right to appeal. *See id.* We held that Ark. R. App. P.—Crim. 10 requires this court to conduct an automatic review of any sentence of death imposed on or after August 1, 2001. *See id.* Thus, we concluded, appellate review of the case must proceed, thereby rendering any motion to waive the appeal moot. *See id.*

On October 3, 2002, we granted the motion of Newman's public defender, Robert Marqutte, to be relieved and appointed Linda Scribner, Esq., to assist the court with this automatic-appeal review. *See Newman v. State*, 350 Ark. 265, 85 S.W.3d 883 (2002) (*per curiam*). Finally, on January 30, 2003, in an unpublished *per curiam* order, this court denied Newman's *pro se* motion to have the mandatory review dismissed so that his death sentence could be carried out immediately. *See Newman v. State*, CR02-811 (Ark. Jan. 30, 2003).

---

[4] Although this court's *per curiam* orders of September 12, 2002, and January 30, 2003, state that an appeal was lodged on Newman's behalf on August 2, 2002, the docket sheet reflects that the partial record was lodged on August 5, 2002.

## I. *Rule 10*

Arkansas Rule of Appellate Procedure—Criminal 10 provides, in pertinent part, that the Arkansas Supreme Court shall consider the following issues in conducting its mandatory review of death sentences imposed on or after August 1, 2001:

> (b) *Mandatory review.* Whenever a sentence of death is imposed, the Supreme Court shall review the following issues in addition to other issues, if any, that a defendant may enumerate on appeal. Counsel shall be responsible for abstracting the record and briefing the issues required to be reviewed by this rule and shall consolidate the abstract and brief for such issues and any other issues enumerated on appeal. The Court shall consider and determine:
>
> (i) pursuant to Rule 4-3(h) of the Rules of the Supreme Court and Ark. Code Ann. § 16-91-113(a), whether prejudicial error occurred;
>
> (ii) whether the trial court failed in its obligation to bring to the jury's attention a matter essential to its consideration of the death penalty;
>
> (iii) whether the trial judge committed prejudicial error about which the defense had no knowledge and therefore no opportunity to object;
>
> (iv) whether the trial court failed in its obligation to intervene without objection to correct a serious error by admonition or declaring a mistrial;
>
> (v) whether the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant;
>
> (vi) whether the evidence supports the jury's finding of a statutory aggravating circumstance or circumstances; and
>
> (vii) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Ark. R. App. P.—Crim. 10(b) (2002). In the instant case, Newman's judgment and commitment order sentencing him to death was entered on June 10, 2002. Accordingly, this court now conducts a mandatory review of Newman's conviction pursuant to Rule 10.

Rule 10 counsel appointed for this automatic appeal has directed this court's attention to five adverse rulings which should be reviewed for error: (1) the circuit court's denial of two motions: the motion to find the death penalty unconstitutional

and the motion to prohibit death qualification of the jury; (2) the circuit court's allowance of Newman to be tried in his orange jail togs and shackles following his waiver of the right to appear in street clothes and the circuit court's order to have Newman gagged during the prosecutor's closing argument; (3) the circuit court's denial of Newman's motion for directed verdict; (4) the circuit court's denial of Newman's motion to have Detective Weaver's testimony stricken because his interrogation occurred after he was represented by counsel; and (5) the circuit court's denial of Newman's objection to the prosecutor's introduction of Newman's prior bad acts.

In addition to these points, there were several instances where Newman's standby counsel noted on the record that Newman did not wish for him to object, but that if he were making the decisions, he would. The circuit court subsequently ruled on these motions but ruled adversely to Newman. We will address these points as well.

Finally, the State has raised several points that will be addressed: (1) the circuit court's refusal to entertain a guilty plea; (2) the circuit court's appointment of counsel over Newman's objection; (3) the circuit court's determination of Newman's competence to proceed; (4) the removal of two jurors for cause; (5) the circuit court's denial of Newman's apparent *pro se* objection to portions of the prosecutor's closing argument;[5] and (6) the circuit court's allowance of the jury to hear the court reporter's tape of Newman's testimony, over standby counsel's objection.

## a. Circuit Court's Denial of Newman's Motions

Prior to trial, Newman withdrew all but two of his pretrial motions. The only surviving motions, which the circuit court considered, were: (1) his motion to quash the criminal information on the grounds that the death penalty is cruel and unusual punishment and, therefore, violative of the Eighth Amendment to the United States Constitution; and (2) his motion to prohibit death qualification of the jury. The circuit court denied both motions.

---

[5] We do not address the argument, because we do not consider Newman's outburst to have been an objection. We do consider the outburst in terms of the propriety of gagging and the circuit court's duty to admonish the jury.

In *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), this court adhered to its prior holdings that the death penalty does not constitute cruel and unusual punishment. This court has further held that death-qualified juries are constitutional. *See, e.g., Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999); *Davis v. State*, 314 Ark. 257, 863 S.W.2d 259 (1993); *Fretwell v. State*, 289 Ark. 91, 708 S.W.2d 630 (1986). Hence, the circuit court did not err in denying Newman's motion on these issues.[6]

*b. Circuit Court's Permitting Newman to Be Tried in Orange Jail Togs and Shackles and Order Having Newman Gagged*

Prior to *voir dire*, Newman waived his right to appear in street clothes and opted to remain in his orange jail togs and shackles throughout the course of the trial. During the prosecutor's closing argument, Newman became disruptive and interrupted the argument several times, which ultimately caused the circuit court to dismiss the jury in order to resolve the matter. On being questioned by the circuit court as to whether he could sit quietly and allow the prosecutor to make his argument, Newman replied that he would "stand on the Fifth Amendment." At that point, the court ordered Newman gagged.

The circuit court did not commit reversible error in either instance. In *Box v. State*, 348 Ark. 116, 71 S.W.3d 552 (2002), this court reiterated its prior holding that "absent a waiver [an] accused should not be forced to trial in prison garb." 348 Ark. at 123, 71 S.W.3d at 556 (quoting *Miller v. State*, 249 Ark. 3, 5, 457 S.W.2d 848, 849 (1970)). In *Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002), this court stated that restraints are not *per se* prejudicial and that the defendant must affirmatively demonstrate prejudice. Arkansas Rule of Criminal Procedure 33.4 provides that a circuit court may order restraints reasonably necessary to maintain order. However, under that rule, the court must make the reasons for the restraints known on the record and must,

---

[6] This court's Rule 10 counsel has further emphasized that as to the motions that Newman withdrew, this court only reviews arguments presented at the trial level. She is correct. Unless the matters waived by Newman fall within one of the other categories to be reviewed by this court on mandatory review, they are not preserved for our review because they constitute an adverse ruling where no objection was made below. *See, e.g., Smith v. State*, 343 Ark. 552, 39 S.W.3d 739 (2001).

upon request by the defendant or his attorney, instruct the jury that the restraint is not to be considered when assessing guilt, whenever the physical restraint occurs in the presence of the jury. *See* Ark. R. Crim. P. 33.4.

■ In the instant case, Newman waived his right to appear in street clothes on the record. In fact, he expressly requested to stay in his jail togs and to remain shackled throughout the trial:

> THE COURT: So having understood, Mr. Newman, that you have the absolute right to be unshackled, the right to have street clothes, what is your decision on what you want?
>
> NEWMAN: Sir, it doesn't matter what I'm wearing, I'm guilty, I killed the lady period.
>
> THE COURT: Do you want—do you want to go ahead, is it my understanding that you want to go ahead and wear the clothes that you have on now, which is the orange jail uniform you've been wearing for sometime and to remain shackled?
>
> NEWMAN: Yes, sir.
>
> THE COURT: When this jury—you want me to do that?
>
> NEWMAN: Yes, sir.
>
> THE COURT: All right, bring the jury in, and the Court is going to find that he has a right that the Rule is for his protection, that he has a right to waive that right, and since it is his choice to stay in the jail uniform the Court is going to permit him to do that along with also being shackled.

Based on this colloquy, Newman manifestly waived his rights to be tried in street clothes and to be tried unshackled. The circuit court did not err in granting Newman's wishes.

■ With respect to the circuit court's order to have Newman gagged, we also hold that the circuit court did not err. In *Illinois v. Allen*, 397 U.S. 337 (1970), the United States Supreme Court made the following statement in reference to dignity, order, and decorum in court proceedings:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court

proceedings in our country. The flagrant disregard in the court-room of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with dis-ruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct him-self properly.

397 U.S. at 343–44.

■ Clearly under *Allen*, the circuit court's actions were constitutionally permissible in the instant case. Moreover, because Newman continued to interrupt the prosecutor's closing argu-ment even after being reprimanded by the circuit court, we agree that gagging him was "reasonably necessary to maintain order." Ark. R. Crim. P. 33.4. The court in making its ruling told New-man that each party was entitled to make an argument to the jury without interruption. In ordering him gagged, the circuit court said that it was not going to "have this in the courtroom, he's not going to do as he pleases." Thus, the circuit court complied with Ark. R. Crim. P. 33.4. There was no abuse of discretion in gag-ging Newman during the prosecutor's closing argument.

### c. Circuit Court's Denial of Newman's Motion for Directed Verdict

Newman's standby counsel made the following motion for directed verdict on Newman's behalf:

MR. MARQUETTE: Your Honor, we'd move for a directed ver-dict at this time on the basis that the State has not proven all the elements of capital murder beyond a reasonable doubt. The testimony has not that has been adduced has not reflected all of the elements and we would move at this time for a directed verdict.

The circuit court denied Newman's motion for directed verdict.

█ █ Arkansas Rule of Criminal Procedure 33.1 requires that where a motion for a directed verdict is made, the motion must specifically state how the evidence is deficient. *See* Ark. R. Crim. P. 33.1(a). Rule 33.1 further provides that the failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required by the rule will constitute a waiver of any question pertaining to sufficiency of the evidence. *See* Ark. R. Crim. P. 33.1(c). Additionally, "[a] motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense." Ark. R. Crim. P. 33.1(c). Likewise, this court has held that it will not address the merits of an appellant's insufficiency argument where his directed-verdict motion was not specific. *See Davis v. State*, 330 Ark. 501, 956 S.W.2d 163 (1997).

█ The circuit court's denial of Newman's directed-verdict motion is not preserved for this court's review. As stated above, Newman's standby counsel merely stated that the testimony did not "reflect" all of the elements of capital murder. As set out in the rule itself, such an objection is insufficient to preserve a sufficiency argument for appeal. Accordingly, we will not address the merits of the sufficiency argument, because the circuit court was not apprised as to how the evidence was deficient. *See, e.g., Pyle v. State*, 340 Ark. 53, 61, 8 S.W.3d 491, 497 (2000). *See also Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998).

d. *Circuit Court's Denial of Newman's Motion to Have Detective Weaver's Testimony Stricken Due to Question Over Whether He Was Represented by Counsel at the Time of the Interrogation and Statement*

Detective Steve Weaver testified that on May 9, 2002, he received a call from the detention center informing him that Newman wished to speak to either Officer Grill or him. He testified that when he visited Newman at the detention center, Newman told him where he had hidden his shirt and the murder weapon. He further testified that while being videotaped, Newman provided him with a detailed account of the murder. It was during this statement that Newman recounted his reasons for killing Cholette and the events of the evening. Detective Weaver testified to Newman's account without objection by counsel. At the

end of the prosecutor's case-in-chief, Newman's counsel moved to strike Detective Weaver's testimony. After hearing counsel's arguments, the circuit court overruled the objection.

█ █ This court has held that to preserve an issue for its review, a proper objection must be asserted at the first opportunity after the matter to which objection has been made occurs. *See Gamble v. State*, 351 Ark. 541, 95 S.W.3d 755 (2003). Because the prosecutor was allowed to continue his inquiry into Newman's statement without interruption by an objection during direct examination *and* cross-examination, the issue is not preserved for lack of a contemporaneous objection. *See e.g., Hale v. State*, 343 Ark. 62, 31 S.W.3d 850 (2000).

█ Though the objection was late, we choose to address the merits of this issue. Newman's counsel moved to strike Detective Weaver's testimony on the basis that at the time of contact between the detective and Newman, Newman was represented by Mr. Marquette. Regardless of whether this was the case, the circuit court's decision on this objection was correct. Detective Weaver testified that on May 9, 2002, "[t]hrough a telephone call from the detention center, I was told that Rick [Newman] wanted to talk to either myself or Lieutenant Grill." This court has indeed stated that *police-initiated* contact is prohibited once a criminal defendant makes known his desire to deal with the police only through counsel and that any subsequent waiver of rights is invalid and renders a resulting confession inadmissable. *See Bussard v. State*, 295 Ark. 72, 747 S.W.2d 71 (1988). Nevertheless, in *Lacy v. State*, 345 Ark. 63, 44 S.W.3d 296 (2001), this court stated that the United States Supreme Court's decision in *Edwards v. Arizona*, 451 U.S. 477 (1981), made clear that an accused may initiate contact with police officers even after asking for an attorney. The same holds true even after the accused has appointed counsel. *See Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997) (quoting David M. Nissman & Ed Hagen, *Law of Confessions*, § 7:10 (2d ed. 1994) ("Even after counsel is appointed . . . a defendant may choose to waive counsel without notice of or consultation with an attorney. . . . [P]olice cannot initiate the contact, but the defendant is free to initiate the contact.")); *see also State v. Coleman*, 56 P.3d 290 (Kan. App. 2002) ("An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he or she has

previously retained counsel does not necessarily render inadmissible an otherwise voluntary statement made by the defendant in his or her counsel's absence."). In the instant case, Newman initiated the contact with Detective Weaver. Accordingly, irrespective of whether Newman was represented by Mr. Marquette at the time of his contact with Detective Weaver, because Newman contacted with police officers himself, the circuit court did not err in denying his motion to strike.

e. *Circuit Court's Denial of Newman's Objection to the State's Presentation of Prior Bad Acts*

During Newman's direct examination, he said: " . . . [T]here is other cases right here in this town where I've hurt people real bad. I don't know why they wasn't brought it up, about it, you know, a fact's a fact." On cross-examination, the prosecutor asked Newman about "anything else [he'd] done" and specifically about a prior conviction in 1998 for battery. Following the prosecutor's question about other acts by Newman, his defense counsel objected:

> MR. MARQUETTE: Judge, I don't have any problems asking— Mr. McCune asking him if he has any felony convictions and what they were for, but if he starts asking about other stuff he's done, you start getting into other crimes. . . .

The circuit court overruled the objection and held that Newman initially brought the matter of other bad acts up and, therefore, opened the door to cross-examination on the point.

██ ██ This court has held that where the defendant has "opened the door" by discussing the matter of prior misconduct during direct examination, he may not object to cross-examination on the point thereafter. *See, e.g., Smallwood v. State*, 326 Ark. 813, 935 S.W.2d 530 (1996). Because Newman stated that he had hurt other people and questioned why such acts had not been brought up, he opened the door to the prosecutor's cross-examination. The circuit court did not abuse its discretion in ruling as it did.

*f. Circuit Court's Denial of Defense Counsel's Objection to Repetitive Photographs*

During Dr. Peretti's testimony, the prosecutor sought to admit several photographs taken by the medical examiner to document Cholette's injuries. Newman's defense counsel interrupted and stated that while his client was not allowing him to object, if he were authorized, he would object on the basis that the photographs were repetitive. The circuit court then overruled defense counsel's "non-motion." Because the circuit court did rule on the matter, it could be considered an adverse ruling to Newman.

This court's standard in reviewing the admissibility of photographs is well-settled:

> This court will not reverse a trial court's admission of photographs absent an abuse of discretion. *See Stewart v. State*, 338 Ark. 608, 999 S.W.2d 684 (1999) (citing *Jones v. State*, 329 Ark. 62, 947 S.W.2d 339, *cert. denied*, 522 U.S. 1002 (1997)). In *Camargo v. State*, 327 Ark. 631, 940 S.W.2d 464 (1997), we discussed the admission of photographs at trial and said:
>
> > Although highly deferential to the trial court's discretion in these matters, this court has rejected a *carte blanche* approach to admission of photographs. *Berry v. State*, 290 Ark. 223, 227, 718 S.W.2d 447, 450 (1986). We have cautioned against "promoting a general rule of admissibility that essentially allows automatic acceptance of all photographs of the victim and crime scene the prosecution can offer." *Id.* at 228, 781 [718] S.W.2d at 450. This court rejects the admission of inflammatory pictures where claims of relevance are tenuous and prejudice is great, and expects the trial court to carefully weigh the probative value of photographs against their prejudicial nature. *Id.* at 228-29, 781 [718] S.W.2d at 450. We require the trial court to first consider whether such evidence, although relevant, creates a danger of unfair prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value. *Beed v. State*, 271 Ark. 526, 609 S.W.2d 898 (1980). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403.
>
> *Camargo*, 327 Ark. at 637, 940 S.W.2d at 467.

*Halford v. State*, 342 Ark. 80, 84, 27 S.W.3d 346, 348 (2000). This court has further said:

> When photographs are helpful to explain testimony, they are ordinarily admissible. Further, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. Other acceptable purposes are to show the condition of the victims' bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. Absent an abuse of discretion, this court will not reverse a trial court for admitting photographs into evidence.

*Mosby v. State*, 350 Ark. 90, 95, 85 S.W.3d 500, 502-503 (2002) (quoting *Barnes v. State*, 346 Ark. 91, 105, 55 S.W.3d 271, 281 (2001) (citations omitted)).

 In the instant case, the photographs are indeed gruesome. On the cumulative point, however, Dr. Peretti testified that the prosecutor was correct that the purpose of photographing Cholette's body was to "help the jury understand the injuries she sustained[.]" He then stepped down from the witness stand and demonstrated exactly what was depicted in each photograph. These pictures showed the condition of Cholette's body and clearly assisted the jury in understanding the nature and extent of her injuries. The circuit court did not abuse its discretion in overruling defense counsel's objection.

*g. Circuit Court's Denial of Defense Counsel's Motion to Suppress Newman's First Written Statement*

Prior to the prosecutor's introduction of Newman's first written confession, his defense counsel entered an objection to the admission of that statement, arguing that, were his client to allow him, he would have filed a motion to suppress the handwritten statement on the basis that at the time, Newman was suffering from mental incompetency. The circuit court overruled the objection. Again, because the circuit court did rule on the matter, it could be considered an adverse ruling to Newman.

 ██ This court reviews a circuit court's denial of a motion to suppress by making an independent determination based on the totality of the circumstances and reverses only if the ruling is clearly against the preponderance of the evidence. *See Jenkins v. State*, 348 Ark. 686, 75 S.W.3d 180 (2002). Newman's first written statement is bizarre. Nevertheless, Dr. Mallory testified that Newman was competent to stand trial and that he was not insane at the time he committed the crime. Nor did defense counsel provide the court with any evidence that Newman may have been suffering from a mental illness at the time of his statement. Based upon the evidence before the circuit court, we cannot say that the circuit court erred in overruling defense counsel's objection. *See, e.g., Copeland v. State*, 343 Ark. 327, 37 S.W.3d 567 (2001).

*h. Circuit Court's Refusal to Entertain Newman's Guilty Plea*

On March 27, 2001, Newman attempted to plead guilty to the charges against him. The circuit court rejected his plea and instead appointed counsel to represent him.

 ██ We discern no prejudicial error in this regard. Arkansas Rule of Criminal Procedure 31.4 prohibits a defendant charged with capital murder from waiving either a jury trial on the issue of guilt or the right to have his sentence determined by a jury unless (1) the court determines the waiver is voluntary and was made without compulsion or coercion, (2) the death penalty has been waived by the State, and (3) the State has assented to the defendant's waiver of his right to a jury trial, and such waiver has been approved by the trial court. *See* Ark. R. Crim. P. 31.4. As the prosecutor had not waived the death penalty, nor assented to Newman's waiver of his right to a jury trial, Newman was not permitted to enter a plea of guilty to capital murder under the clear terms of the rule. *See* Ark. R. Crim. P. 31.4.

*i. Circuit Court's Appointment of Counsel over Newman's Objection*

 Over Newman's objection, the circuit court continued its appointment of Mr. Marquette as standby counsel, even after Newman expressed his desire to represent himself. Again, we agree with the State that this was not prejudicial error. We are not aware of any authority for the proposition that the appointment of

standby counsel over a defendant's objections where he wished to represent himself is considered prejudicial error. We find no basis for reversal on this point.

### j. Circuit Court's Determination of Newman's Competence to Proceed

██ ██ Following Dr. Mallory's testimony that Newman was mentally fit to stand trial at the omnibus hearing, the circuit court made its finding on Newman's competency and agreed with Dr. Mallory. This court will affirm a finding of fitness to stand trial if there is substantial evidence to support the circuit court's finding. *See Ware v. State*, 348 Ark. 181, 75 S.W.3d 165 (2002). A criminal defendant is presumed to be competent, and the burden of proving incompetence is on the accused. *See id.*

██ In the instant case, the only evidence presented by Newman at the pretrial hearing on the subject of his competency was the testimony of Dr. Mallory. Dr. Mallory said that "[i]n light of any disconfirming data, his attitudes or abilities or mentation is changed, it would be my continued opinion that [Newman]'s fit to stand trial." We conclude that Dr. Mallory's opinion is substantial evidence of Newman's competency to stand trial.

### k. Circuit Court's Removal of Jurors for Cause

██ The issue next posited for our review concerns the circuit court's failure to remove jurors for cause. The State asserts that two jurors were excused for cause. Despite this assertion, the record reveals that four jurors were actually excused by the court. The State, irrespective of the number, is correct in its assertion that the issue is not preserved for our review. Any issue pertaining to the removal of jurors is not preserved for this court's review where a defendant has not exhausted all of his peremptory challenges. *See Dillon v. State*, 317 Ark. 384, 877 S.W.2d 915 (1994). Newman did not use all of his peremptory challenges in this case, and, thus, the issue is not properly before us.

### l. Circuit Court's Playing of Court Reporter's Recording of Newman's Testimony Over His Objection

During the jury's deliberations, the jury notified the bailiff that it had a question for the circuit court. The bailiff informed

the circuit court that he told the jury it would have to submit a written question. At that point, the circuit court discussed the matter on the record with both parties. The court advised the parties that the jury wished to get a transcript due to a disagreement among the jurors regarding the testimony. Newman's counsel advised the court that he believed the court should tell the jury to "try to remember." Despite defense counsel's objection, the circuit court told the bailiff:

> THE COURT: You can tell them that if they want, we'll be glad to try to find it and play it, if you want.

The jury later returned to the courtroom at which time it submitted, by written question, a request for Newman's testimony in reference to why he took Cholette to the camp. The court inquired again whether it was agreeable to both sides to find the testimony and provide it to the jury. Again, Mr. Marquette told the court that his preference was for the court to tell the jury to remember the testimony. The court then instructed the jury that the two parties could not agree and that the jury would have to try and recall the testimony. A little more than an hour later, the circuit court called the jury back into the courtroom and told the jury that the court had changed its mind and would allow the jury to hear the tape. Newman's defense counsel renewed his objection. The question for this court to resolve is whether the circuit court abused its discretion in replaying Newman's testimony and whether Newman was prejudiced as a result.

The record in this case reflects that the jury submitted the following written question to the circuit court:

> Request Ricky Newman's Testimony, in reference to why he took her to the camp.

> Have one juror that doesn't understand premeditated.

It further reflects the following entry upon the circuit court's agreement to replay the testimony:

> THE TESTIMONY OF RICKY NEWMAN IS PLAYED BEFORE THE JURY FROM THE COURT REPORTER'S TAPE.

Our Criminal Code provides:

> (e) After the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence, or if they desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the counsel of the parties.

Ark. Code Ann. § 16-89-125(e) (1987). This court has held that the question of whether a jury is in sufficient disagreement or confusion to merit being given the requested information should be examined on a case-by-case basis. *See McKinney v. State*, 303 Ark. 257, 797 S.W.2d 415 (1990). In the case at hand, at least one juror plainly was in doubt about whether Newman's taking Cholette to the camp was evidence of a premeditated intent. This, apparently, in the circuit court's opinion, was enough to justify replaying Newman's testimony to the jury in accordance with the statute.

 Although we cannot tell from the record whether all or a portion of Newman's testimony was replayed, we note that no prejudice would have resulted under either scenario. We have said that when both a witness's direct examination and cross-examination have been played to the jury, no prejudice resulted. *See, e.g., McKinney v. State, supra.* Moreover, if only that specific portion of Neman's testimony requested by the jury was played, then the issue fell within the circuit court's discretion. This court has observed that a circuit court should honor any request of a jury to hear specific evidence. *See Gardner v. State*, 263 Ark. 739, 569 S.W.2d 74 (1978). In the absence of some compelling reason why the circuit court should not grant such a request, the action of the court in permitting trial testimony to be replayed should not be reversed in the absence of a manifest abuse of discretion. *See id.* Hence, assuming the circuit court played all or only that part of Newman's testimony requested by the jury, we hold that there was no abuse of discretion and that no prejudice resulted.

## II. Mistrial or Admonition

This court's Rule 10 counsel found no error relating to whether the circuit court failed in its obligation to intervene without objection to correct a serious error by admonition or by declaring a mistrial even though no objection had been made.

Ark. R. App. P.—Crim. 10(b)(iv). The State, however, raises the matter of the prosecutor's closing argument at trial. During closing argument, the prosecutor made the following statements:

> I don't know if that's the real reason Ricky Newman killed Marie Cholette. I think it's clear and it's beyond a doubt that Ricky Newman is the one that killed Marie Cholette, I personally think that Ricky Newman killed her as a sex crime. I think he tried to wine and dine her, and she either rejected him or he couldn't get an erection and she made fun of him, something along that line and he went berserk, he went mad and he's not gonna be treated that way, he's Ricky Newman, he's Renegade, and no one's gonna treat Ricky Newman Renegade like that.

In *Howard v. State*, 348 Ark. 471, 79 S.W.3d 273 (2002), this court stated that the circuit court has a fundamental duty to insure that the defendant's rights are protected and that the defendant receives a fair trial as constitutionally guaranteed. This court further said in *Howard* that "[p]rejudicial remarks by a prosecutor seeking the death penalty should not be tolerated." 348 Ark. at 287, 79 S.W.3d at 287. Furthermore, in *Neff v. State*, 287 Ark. 88, 696 S.W.2d 736 (1985), we said: "[a]lthough it is not good practice for counsel to inject their personal beliefs into the closing arguments, mere expressions of opinion by counsel in closing argument are not reversible error so long as they do not purposely arouse passion and prejudice." 287 Ark. at 94, 696 S.W.2d at 740. This court has also remarked that some leeway is given to counsel in closing argument and that counsel are free to argue every plausible inference which can be drawn from the testimony. *See Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996).

In the case at hand, it seems plausible, based upon the injuries Cholette sustained, that she may well have been a victim of a sex crime, even though direct evidence supporting that theory is lacking. Because the prosecutor's statements were plausible, we are loath to conclude that the prosecutor purposely aroused passion and prejudice so as to constitute reversible error. Nor do we conclude that the remarks rose to the level that the circuit court had a duty to intervene and correct the prosecutor's statements on its own motion.

A corollary issue relating to the prosecutor's closing argument concerned whether the circuit court had a duty to admonish

the jury, on its own accord, to disregard statements made by Newman during the prosecutor's closing argument. Following the argument quoted above, Newman became disruptive, and this colloquy ensued:

| | |
|---|---|
| NEWMAN: | You're a lying mother fucker dude! |
| THE COURT: | Let's not have any talk. |
| NEWMAN: | Fuck him, that ain't the way it goes. |
| PROSECUTOR: | That's just . . . |
| NEWMAN: | . . . hey, mother fucker, why don't you tell . . . |
| THE COURT: | . . . Mr. Newman, Mr. Newman, if you say one more word you're going to be gagged, I'm not going to put up with that, so this is keep your mouth shut! |
| NEWMAN: | . . . mother fucker . . . |

[State continues its closing.]

| | |
|---|---|
| NEWMAN: | . . . what the fuck happen to you . . . |

. . . .

(BAILIFF REMOVES THE JURY FROM THE COURTROOM.)

. . . .

(BAILIFF GAGS THE DEFENDANT)
(JURY IS RETURNED TO THE JURY BOX)

| | |
|---|---|
| BAILIFF: | The jury is in. |
| THE COURT: | All right, go ahead, Mr. McCune. |

No admonishment or declaration of a mistrial was requested by defense counsel, nor given by the court, that the jury should disregard the appellant's outbursts.

This court has held that a mistrial is an extreme and drastic remedy which will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *See Jenkins v. State*, 348 Ark. 686, 75 S.W.3d 180 (2002). In the instant case, we hold that Newman was not in any way prejudiced by the circuit court's failure to admonish the jury or to declare a mistrial. Although Newman's outbursts were disruptive and undoubtedly were heard by the jury,

we cannot say that the fundamental fairness of the trial was manifestly affected such that a mistrial was justified. Nor do we conclude that an admonishment to the jury was warranted. Accordingly, we find no reversible error under this point.

### III. Aggravating Circumstances

The jury unanimously determined that the following aggravating circumstances existed beyond a reasonable doubt at the time of the commission of capital murder: (1) that Newman had previously committed another felony, an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person; and (2) that the capital murder was committed in an especially cruel or depraved manner.

Arkansas Code Annotated § 5-4-604 sets forth the aggravating circumstances recognized by our criminal code. Subsection (3) provides that one aggravating circumstance is that "[t]he person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person[.]" Ark. Code Ann. § 5-4-604(3) (Supp. 2001). An additional aggravating circumstance under the statute is where "[t]he capital murder is committed in an especially cruel or depraved manner." Ark. Code Ann. § 5-4-604(8)(A) (Supp. 2001). The subsection sets forth the definitions for cruel and depraved:

> (B)(i) For purposes of subdivision (8)(A) of this section, a capital murder is committed in an especially cruel manner when, as part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse, or torture is inflicted.
>
> (ii)(a) "Mental anguish" is defined as the victim's uncertainty as to his ultimate fate.
>
> (b) "Serious physical abuse" is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ.
>
> (c) "Torture" is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.

(C) For purposes of subdivision (8)(A) of this section, a capital murder is committed in an especially depraved manner when the person relishes the murder, evidencing debasement or perversion, or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder[.]

Ark. Code Ann. § 5-4-604(8)(B-C) (Supp. 2001).

 During the guilt phase of the trial, Newman admitted beating a man "half to death and [leaving] him lay." During the penalty phase, the prosecutor also introduced into evidence Newman's judgment and conviction dated December 11, 1998, where he was convicted of the felony offense of battery in the second degree. The prosecutor further introduced photographs of the battery victim. Without question, there was sufficient evidence to support the jury's finding of a prior felony conviction involving violence.

 Furthermore, there was ample testimony and evidence to support a finding that Cholette suffered serious physical abuse, as well as torture, as defined under § 5-4-604(8). Dr. Peretti testified that while still alive, part of Cholette's vagina had been removed, her neck had been slit, and she had sustained severe injuries to her anal area. Newman's own testimony during the penalty phase of his trial was to the effect that he enjoyed killing Cholette. We hold that all of this constitutes substantial evidence that the murder was committed in a cruel and depraved manner.

## IV. Passion or Prejudice of the Jury

This court's Rule 10 counsel and the State are in agreement that Newman's death sentence was not the result of passion, prejudice, or any other arbitrary factor. The jury deliberated more than four hours on the issue of guilt. Following the penalty phase, they deliberated forty minutes. Even though Newman actively sought the death penalty and made that point to the jury, the jury was attentive, examined the evidence, and deliberated over its verdicts. This is comparable to what happened in State v. Robbins, 342 Ark. 262, 27 S.W.3d 419 (2000), where we said:

> This case is unique. From its inception, the defendant not only did not oppose but has actively sought imposition of the death penalty as the appropriate sanction for his criminal conduct. This, coupled with his decision to represent himself at trial,

means that the adversarial process characteristic of the criminal justice system proceeded differently. That the jury ultimately sentenced Robbins to death is not evidence that they acceded to his wishes. The jury is presumed to follow the court's instructions. *Logan v. State*, 300 Ark. 35, 776 S.W.2d 341 (1989).

342 Ark. at 270, 27 S.W.3d at 423.

■ We hold that the death sentence was not the result of passion or prejudice.

No reversible error appears for the remaining issues enumerated under Ark. R. App. P.—Crim. 10.

Affirmed.