Marco Allen CHAPMAN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2005–SC–000070–MR.

Supreme Court of Kentucky.

Aug. 23, 2007.

Concurring Opinion Ordered Published
Dec. 27, 2007.

As Modified on Denial of Rehearing
April 21, 2008.

Reconsideration Denied Oct. 23, 2008.

Donna L. Boyce, Appellate Branch Manager, Emily Holt Rhorer, Assistant Public Advocate, Randall L. Wheeler, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, David A. Smith, Assistant Attorney General, Tami Renee Stetler, Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice MINTON

## I. *INTRODUCTION.*

During the course of robbing Carolyn Marksberry, Marco Allen Chapman raped and stabbed her before stabbing her three small children, killing two of them. Appearing in circuit court to answer for these brutal crimes, Chapman made an unusual plea agreement with the Commonwealth in which he agreed to plead guilty and volunteered for the death penalty. The circuit court ultimately accepted the plea agreement and sentenced Chapman to death.

The case before us is the review of Chapman's conviction and sentence in which we are asked to resolve several questions concerning the death penalty in Kentucky. The ultimate question is whether a defendant may enter into a plea agreement to forgo a jury trial and sentencing and volunteer for the death penalty. We answer that question in the affirmative.

## II. *FACTS AND PROCEDURAL HISTORY.*

The facts of this heinous crime are not disputed. In August 2002, Chapman entered Marksberry's home in Gallatin County, Kentucky, where he raped and stabbed Marksberry, who survived. He then stabbed Marksberry's three young children. Cody and Chelbi died. Courtney survived.

Chapman was quickly apprehended in West Virginia. He told the West Virginia authorities [1] that he was "gonna go get some party materials and park out in the woods somewhere and die." Chapman also asked one of the policemen: "[H]ow about doing me a favor and put a bullet in my forehead[?]" He told the authorities that he hoped he would not live three weeks to turn thirty-one and that "[a] bullet is the only help I can get."

Chapman provided the West Virginia authorities with many of the chilling details of his crimes against the Marksberrys. He claimed that he and Marksberry had been involved in a sexual relationship for about a year, and he knew that her husband was working overseas. Chapman stated that he came to Marksberry's home on the day in question armed with a knife. He planned to have sex with her and to rob her afterwards. He said that they had consensual sex but then she had "raised all kinds of hell" when he told her that he was going to take money from her. Chapman told the authorities that he bound Marksberry with a vacuum cleaner cord and gagged her with duct tape. Chapman said that he first stabbed Marksberry and then stabbed her three screaming children.

Chapman was later indicted for two counts of capital murder, two counts of

---

1. The trial court denied Chapman's motion to suppress the statements he made to the West Virginia authorities; that ruling has not been challenged in this appeal.

attempted murder, one count of rape in the first degree, one count of burglary in the first degree, one count of robbery in the first degree, and one count of being a persistent felony offender in the second degree. Chapman's appointed counsel filed numerous pretrial motions, including a successful motion to change venue from Gallatin to Boone County. During pretrial proceedings, the trial court ordered Chapman to undergo the first of three competency evaluations at the Kentucky Correctional Psychiatric Center (KCPC). After the first evaluation, the trial court conducted a hearing to determine Chapman's competency to stand trial. At that hearing, Dr. Steven Free, a psychologist from KCPC, testified that Chapman had a history of mental health-related issues. But Dr. Free concluded that Chapman was competent to stand trial. And at the close of that hearing, the trial court ruled that Chapman was competent to stand trial.

Not long after the first competency ruling, Chapman wrote a letter to the trial court in which he stated that he wanted to dismiss his attorneys, waive a jury trial and sentencing, plead guilty to all the charges, and be sentenced to death. In that letter, Chapman expressed remorse for his crimes and stated that he was "willingly ready to accept the sentence of death ... because ... that is the only acceptable sentence for the crimes I have [committed] against the [Marksberrys] and humanity itself." The trial court then ordered Chapman back to KCPC for a second competency evaluation.

Following the second evaluation by Dr. Free, the trial court conducted a second hearing regarding Chapman's competency to enter into the plea agreement. At that hearing, Dr. Free testified that he believed Chapman was competent but expressed the thought that Chapman's decision to fire his attorneys and to ask to be execut-

ed could possibly change if he received mental health treatment. Chapman also testified. So the trial court delayed ruling on Chapman's motion to plead guilty; instead, it ordered Chapman back to KCPC "for a period of thirty days for treatment and examination."

A few weeks later, the trial court conducted a third hearing on Chapman's competency. This time, Dr. Free testified that Chapman had been given an antidepressant medication (Zoloft) at KCPC resulting in little to no change in Chapman's mental health. Dr. Free again opined that Chapman was not incompetent. The trial court then ruled that Chapman was competent to fire his attorneys, to plead guilty, and to seek death. Final sentencing was set for the following week. Over the objections of both Chapman and his former attorneys, the trial court appointed the same attorneys Chapman fired to act as his standby counsel.

At the final sentencing hearing, the Commonwealth presented brief testimony to establish the essential underlying facts of the case, including testimony by Marksberry. The trial court reiterated to Chapman its belief that Chapman was making a mistake in firing his attorneys and waiving his right to jury sentencing and/or trial. But the trial court acknowledged to Chapman that there was no legal authority preventing him from pleading guilty and seeking death. The trial court observed that rejecting the death sentence in the plea agreement would likely prompt Chapman to withdraw his guilty plea only to ask a jury to sentence him to death. The trial court then stated that it had read a psychological report delivered to chambers by standby counsel containing mitigation evidence. The trial court made clear that it had considered the content of the report for Chapman's competency. The trial court stated that it had not considered the

mitigation evidence because Chapman did not want to present any mitigation evidence.

The trial court then sentenced Chapman to death for the murder of Cody and Chelbi, twenty years' imprisonment on each attempted murder conviction, life imprisonment for his rape conviction, twenty years' imprisonment for his robbery conviction, and twenty years' imprisonment for his burglary conviction. The attempted murder convictions, the burglary conviction, and the robbery convictions were enhanced to sentences of life imprisonment due to Chapman's status as a persistent felony offender in the second degree. In the trial judge's mandatory report, the trial judge stated that "[t]he issue the [Kentucky Supreme] Court should review is whether a defendant can enter into a plea agreement and negotiate for the death penalty." The Department of Public Advocacy then filed this appeal on Chapman's behalf.[2]

### III. CHAPMAN'S ISSUES ON APPEAL.

Chapman raises several arguments, many of which are so interconnected that we will combine them in our analysis:

1) The death penalty is unconstitutional;

2) Lethal injection and electrocution violate the Eighth Amendment to the United States Constitution's prohibition against the imposition of cruel and unusual punishments;

3) This Court's method of conducting a proportionality review of death sentences is unconstitutional;

4) Chapman's death sentence is arbitrary and disproportionate;

5) Residual doubt bars Chapman from receiving the death penalty;

6) Chapman's due process rights were violated when the aggravators that made him death-eligible were not set forth in the indictment;

7) The trial court erred by requiring the same attorneys Chapman had already fired to serve as standby counsel since those attorneys disagreed with his stated goal of seeking the death penalty;

8) The trial court erred by refusing to consider certain mitigating evidence (i.e., a psychologist's report detailing Chapman's history of mental health-related issues, including a history of physical and substance abuse) tendered by his standby counsel;

9) The Commonwealth's Attorney acted improperly by negotiating a plea agreement with Chapman himself during the time period when Chapman was still represented by counsel;

10) The trial court should have used a more stringent competency standard in light of Chapman's history of abuse and of mental health-related issues;

11) This Court should not permit Chapman to commit "suicide by court"; and

12) Chapman's convictions and sentence should be reversed under the cumulative error doctrine.

### IV. ANALYSIS.

#### A. The Death Penalty is Not Unconstitutional.

■ This issue, along with others, is unpreserved. Nevertheless, we review un-

2. See Kentucky Revised Statutes (KRS) 532.075(1). ("Whenever the death penalty is imposed for a capital offense, and upon the judgment becoming final in the Circuit Court, the sentence shall be reviewed on the record by the Supreme Court.") For simplicity's sake, this opinion will refer to the arguments advanced on Chapman's behalf as being advanced by Chapman himself.

preserved errors in death penalty cases, using the following standard: "(1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed."[3] We have repeatedly ruled that Kentucky's death penalty statute is not unconstitutional,[4] and Chapman has presented nothing new which causes us to change that conclusion.

B. *Lethal Injection and Electrocution are Not Cruel and Unusual Punishments Forbidden by the Eighth Amendment.*[5]

We have consistently held that neither lethal injection nor electrocution is an un-

constitutional violation of the Eighth Amendment's proscription against cruel and unusual punishment,[6] and Chapman has not presented anything causing us to doubt that conclusion.

C. *This Court's Method of Proportionality Review is Constitutional, and Chapman is Not Entitled to Data Collected Under KRS 532.075(6).*

KRS 532.075(3)(c) requires this Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Chapman contends that our proportionality review is flawed because our review encompasses only cases in which the death penalty is imposed, rather than allegedly "similar" cases in which the defendant was not sentenced to death. We have rejected such claims that our method of proportionality review is constitutionally flawed,[7] and Chapman's counsel have not presented us with compelling reasons to change that conclusion.

3. *Johnson v. Commonwealth,* 103 S.W.3d 687, 691 (Ky.2003).

4. *See, e.g., Thompson v. Commonwealth,* 147 S.W.3d 22, 55 (Ky.2004) ("Appellant asks this Court to declare Kentucky's death penalty statute unconstitutional. The constitutionality of the death penalty statute is well settled. Appellant's assertion that Kentucky's death penalty statute operates in a discriminatory and arbitrary fashion is without merit." (footnote omitted)).

5. This issue is also unpreserved.

6. *Wheeler v. Commonwealth,* 121 S.W.3d 173, 186 (Ky.2003) ("Wheeler argues that the death penalty is unconstitutional under the federal and Kentucky constitutions because the method used to carry out the sentence, lethal injection, is cruel and unusual punishment. Wheeler's claim that lethal injection is a violation of the Eighth Amendment against cruel and unusual punishment is without any

case law support from Kentucky or elsewhere.... Certainly, it is not cruel and unusual punishment. Death by electrocution also does not violate either federal or Kentucky law. *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Wheeler has also failed to demonstrate that either method of execution conflicts with any societal norms."); *see also Baze v. Rees,* 217 S.W.3d 207, 211–12 (Ky.2006); *Epperson v. Commonwealth,* 197 S.W.3d 46, 64 (Ky.2006), *cert. denied* —— U.S. ——, 127 S.Ct. 1840, 167 L.Ed.2d 337 (2007).

7. *See, e.g., Sanders v. Commonwealth,* 801 S.W.2d 665, 683 (Ky.1990); *Epperson,* 197 S.W.3d at 63–64 ("This Court on many occasions has determined that the proportionality review it conducts is in conformity with KRS 532.075(3) and is constitutional. Under all the circumstances of this case, the death penalty is entirely appropriate, the proportionality review conducted by this Court does not

We, likewise, reject Chapman's claim that our proportionality review is constitutionally infirm because we do not provide defense counsel with access to the data we compile in death penalty cases under KRS 532.075(6).[8] We have rejected this argument many times,[9] and Chapman's counsel have not presented us with a compelling reason to reconsider that holding.

### D. *Chapman's Death Sentence is Not Disproportionate.*

■ Although Chapman's case is unique in that he actively sought to receive the death penalty as a punishment for his offenses, we have, nevertheless, engaged in the proportionality review required by KRS 532.075(3). Chapman brutally stabbed two innocent children to death, meaning that his sentence of death certainly is not disproportionate to his brutal and abhorrent crimes.[10] Based on our review of the record, the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. There was ample evidence to support the finding of the statutory aggravating factors, such as causing intentional multiple deaths and causing those deaths during the commission of other felony offenses, burglary and robbery. We have also reviewed all relevant cases decided since

---

violate due process or equal protection of either the Federal or State Constitution." (internal citations omitted)); *Harper v. Commonwealth*, 694 S.W.2d 665, 671 (Ky.1985) ("The Public Advocate has the curious idea that we consider all previous cases which were tried or could have been tried as capital cases. This is a mistaken belief. KRS 532.075(6) refers to records of all felony offenses in which the *death penalty was imposed* after January 1, 1970, or such earlier date as the court may deem appropriate."); *see also, e.g., State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192, 1198 (1992) ("As our final task, we have undertaken a comparison of the sentence in this case to those in which we have *previously imposed the death penalty*. We find appellant's death sentence to be appropriate in this case, as it is neither excessive nor disproportionate.") (emphasis added).

8. KRS 532.075(6) provides as follows:

The Chief Justice shall assign to an administrative assistant who is an attorney the following duties:
(a) To accumulate the records of all felony offenses in which the death penalty was imposed after January 1, 1970, or such earlier date as the court may deem appropriate.
(b) To provide the court with whatever extracted information it desires with respect thereto, including but not limited to a synopsis or brief of the facts in the record concerning the crime and the defendant.

(c) To compile such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence.

9. *See, e.g., Epperson*, 197 S.W.3d at 63 ("The concerns expressed by Epperson about his inability to access the data are without merit. This Court does not use any secret data, but simply compares one death penalty case with all the other cases in which the death sentence was imposed after January 1, 1970."); *Harper*, 694 S.W.2d at 670–71 ("For some reason, obscure to us, the Public Advocate keeps insisting on access to the data collected by this court under the provisions of KRS 532.075(6). We had thought that [*Ex Parte Farley*, 570 S.W.2d 617 (Ky.1978)], settled this question. There is no articulated reason why the Public Advocate cannot assemble this data for use in capital cases We state in our opinions all matters considered by us, and in no way are mysterious and secret records or data taken into account in our deliberations. The time and effort expended in arguing this point would suffice to compile all the data we consider."); *Stopher v. Commonwealth*, 57 S.W.3d 787, 807 (Ky.2001) ("Failure to provide access to data collected by this Court pursuant to KRS 532.075(6) did not deny Appellant due process of law.").

10. *See, e.g., Johnson*, 103 S.W.3d at 698 ("Considering the extremely brutal nature of the murder at issue here, it cannot be said that the penalty Appellant received was inappropriate.").

1970 in which the death penalty was imposed, particularly those in which a defendant was sentenced to death for multiple intentional murders.[11] In short, our review has led us to conclude that "the sentence of death here was not excessive or disproportionate to the penalties imposed in similar cases considering both the crimes and the defendants." [12]

### E. Residual Doubt Does Not Bar Chapman's Death Sentence.

Chapman contends that residual doubt, mainly concerning his competency, bars him from receiving the death penalty. We will discuss the issue of Chapman's competency in detail elsewhere in this opinion, but we see no reason to depart from our consistent holding that residual doubt plays no role in appellate review.[13]

### F. Chapman's Indictment is Not Defective Because it Fails to Enumerate the Aggravators that Made Him Eligible for the Death Penalty.[14]

Under Kentucky law, a person is not eligible to receive the death penalty unless at least one of the statutory aggravators set forth in KRS 532.025(2)(a) is found to apply.[15] Chapman's indictment did not describe the aggravators the Commonwealth believed made Chapman eligible to receive the death penalty. Instead, the same day the indictment was filed by the Gallatin Circuit Clerk, the Commonwealth filed a notice under KRS 532.025 that it was seeking the death penalty.[16] That notice set forth the aggravating circumstances that the Commonwealth believed made Chapman eligible to receive the death penalty. The Commonwealth cited as aggravators the fact that Chapman's acts resulted in multiple intentional deaths and that the murders occurred during the course of Chapman committing rape in the first degree, robbery in the first degree, and burglary in the first degree. Chapman now contends that his constitutional rights were violated because the indictment did not contain those aggravators.

We have rejected arguments along these

---

11. Rather than belaboring this opinion with a string cite containing the cases we examined during the course of our proportionality review, we incorporate by reference the list found in *Hodge v. Commonwealth*, 17 S.W.3d 824, 855 (Ky.2000). We have incorporated that list in other cases, such as *Parrish v. Commonwealth*, 121 S.W.3d 198, 208 (Ky. 2003). We have also reviewed the applicable cases rendered after *Hodge*.

12. *Epperson*, 197 S.W.3d at 64.

13. *See, e.g., Tamme v. Commonwealth*, 973 S.W.2d 13, 40 (Ky.1998); *Epperson*, 197 S.W.3d at 65 ("The United States Supreme Court and this Court have held that residual doubt is not a mitigating circumstance for the death penalty. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), *accord Tamme v. Commonwealth, supra*. A finding of guilt as to aggravating circumstances in a death penalty case is considered under the reasonable doubt standard. Here, the evidence presented was sufficient to establish guilt beyond a reasonable doubt so as to meet the legal standards and constitutional requirements.").

14. Chapman admits this issue is unpreserved.

15. *See* KRS 532.025(3) ("In all cases unless at least one (1) of the statutory aggravating circumstances enumerated in subsection (2) of this section is so found, the death penalty, or imprisonment for life without benefit of probation or parole, or the sentence to imprisonment for life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years of his sentence, shall not be imposed.").

16. KRS 532.025(1)(a) provides that the Commonwealth may introduce at a capital sentencing hearing "only such evidence in aggravation as the state has made known to the defendant prior to his trial...."

lines many times before,[17] and we have been shown no compelling reason to depart from that settled position.

### G. *The Trial Court Did Not Err When it Appointed Chapman's Recently–Terminated Counsel as Standby Counsel.*

■ Chapman argues that the trial court erred by appointing standby counsel for him over his objection. He argues that the trial court compounded its error by agreeing to the Commonwealth's suggestion that Chapman's recently-fired attorneys should be ordered to stay on as standby counsel over the objections of Chapman and the attorneys. The Commonwealth contends that the appointment of standby counsel is a practice endorsed by this Court to advance, not to hinder, a pro se defendant's interests. Unfortunately and inexplicably, however, the Commonwealth does not substantively address Chapman's counsel's contention that an attorney recently fired by a defendant should not be forced to be standby counsel for that same defendant.

■ A criminal defendant has a constitutional right to be represented by counsel.[18] "Conversely, a defendant also has a state and federal constitutional right to proceed *without a* lawyer."[19] But a defendant's right to proceed without a lawyer is not absolute.[20] For example, a trial court must hold a hearing to ensure that a defendant's waiver of counsel has been made voluntarily and intelligently.[21] And a defendant's choice to waive counsel must be competently made.[22] The standard for determining a defendant's competency to waive counsel is the same standard used to determine if a defendant is competent to stand trial.[23]

■ Most important to this issue is the precedent holding that a trial court may appoint standby counsel for a defendant even if the defendant objects to such an

17. *See, e.g., Soto v. Commonwealth,* 139 S.W.3d 827, 841–43 (Ky.2004); *Ernst v. Commonwealth,* 160 S.W.3d 744, 752 (Ky.2005) ("Finally, although Appellant argues that the indictment did not set forth the essential elements of the capital kidnapping offense, we also note that the indictment is not required to recite the aggravating circumstance necessary to seek capital punishment so long as the Commonwealth satisfies the notice requirement in KRS 532.025(1)(a).").

18. *See, e.g.,* Ky. Const. § 11 ("In all criminal prosecutions the accused has the right to be heard by himself and counsel...."); *Hill v. Commonwealth,* 125 S.W.3d 221, 225 (Ky. 2004) ("The right to counsel is protected by the Sixth Amendment to the United States Constitution and was firmly established in the seminal case, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Section 11 of the Constitution of Kentucky independently recognizes the importance of counsel to assist the defendant in a criminal trial. We have held that '[t]he right to counsel is a fundamental constitutional right.' [*Jenkins v.*

*Commonwealth,* 491 S.W.2d 636, 638 (Ky. 1973) ].").

19. *Hill,* 125 S.W.3d at 225.

20. *Martinez v. Court of Appeal of California, Fourth Appellate Dist.,* 528 U.S. 152, 161, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000).

21. *Id.* at 528 U.S. 162, 120 S.Ct. 684.

22. *Commonwealth v. Berry,* 184 S.W.3d 63, 65 (Ky.2005) ("A defendant's choice to represent himself must be competent and intelligent."). Chapman's competency is discussed at length elsewhere in this opinion.

23. *Godinez v. Moran,* 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) ("Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights.").

appointment.[24] So we reject Chapman's contention that the trial court committed a per se error by appointing standby counsel over his objection. But the real question is: Did the trial court err when it appointed as standby counsel the very attorneys it had just allowed Chapman to fire?

The parties' briefs have not cited to a case in which a recently-fired attorney was appointed as standby counsel over the objection of the pro se defendant. We have located cases where a recently-fired attorney was appointed as standby counsel with the defendant's apparent consent.[25] Of course, the situation in the case at hand is vastly different because Chapman explicitly stated that he wanted no counsel at all and, furthermore, wanted different counsel if the trial court was determined to appoint standby counsel.

But we see distinct advantages for Chapman in the appointment of these recently-fired attorneys. For example, these attorneys were already familiar with the case, meaning that the case could have gone forward quickly and easily if Chapman had later withdrawn his request to proceed pro se. And although Chapman's standby counsel informed the trial court of their moral and legal objections to Chapman's desired course of conduct, Supreme Court Rule (SCR) 3.130(1.2)(a)-(b) states that an attorney must defer to the client's choice of whether to plead guilty and that an attorney's representation of a client does not constitute an endorsement of that client's social or moral viewpoint.[26] We are aware that SCR 3.130(1.16)(b)-(c) permits an attorney to withdraw from representing a client if the client persists upon pursuing an objective that the attorney considers "repugnant or imprudent." But counsel in this case were not required to continue as Chapman's actual counsel of record—rather, they were required to function in the limited role of standby counsel. And we have held that an attorney whose client is pursuing an objective the attorney finds repugnant may not withdraw if ordered to remain on the case by the trial court.[27]

24. *Martinez*, 528 U.S. at 162, 120 S.Ct. 684 ("A trial judge may also terminate self-representation or appoint 'standby counsel—even over the defendant's objection—if necessary."); *accord Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("Of course, a State may-even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary."); *McKaskle v. Wiggins*, 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection—to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals.").

25. *See, e.g., State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

26. *See St. Clair v. Commonwealth*, 140 S.W.3d 510, 561 (Ky.2004) ("And, although counsel may have a basis to withdraw if the defendant's decision constitutes the pursuit 'of an objective that the lawyer considers repugnant or imprudent,' SCR 3.130–1.16(b)(3), counsel may not withdraw if the tribunal orders the representation to continue."); *see also* SCR 3.130(1.16)(c) ("When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.").

27. SCR 3.130(1.2) provides, in relevant part, as follows:

(a) A lawyer shall abide by a client's decision concerning the objectives of representation.... In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b) A lawyer's representation of a client, including representation by appointment,

■ A newly-appointed standby counsel would have been similarly obligated to assist Chapman in carrying out his stated objective of seeking the death penalty regardless of whether that attorney believed that objective to be either legally or morally misguided. And appointment of "fresh" counsel may have worked to Chapman's disadvantage since that counsel would not have been as familiar with the facts and circumstances of the already two-year old case, meaning that the likelihood of that attorney seeking a continuance would have been greater, thereby thwarting Chapman's stated aim of being sentenced to death simply and quickly. Moreover, a defendant is not entitled to a specific court-appointed counsel of his own choosing.[28] Finally, the alleged communication breakdown and irreconcilable differences between Chapman and his attorneys is belied by the fact that Chapman continued to confer with them during the sentencing hearing—after they had become standby counsel. When the trial court asked Chapman if he waived the preparation of a sex offender risk assessment, Chapman consulted his standby counsel before answering. Also, the videotape of the sentencing shows Chapman huddling with counsel at another point, although the substance of that whispered conversation cannot be ascertained from the tape.

We recognize that this case presented unique and challenging issues for the trial court and counsel for both sides. We further recognize that appointing a recently-fired attorney to act as a defendant's standby counsel may not be wise or proper in all cases. But because a trial court possesses the inherent authority to appoint standby counsel for a pro se defendant—regardless of whether that defendant wants standby counsel—and that counsel is obligated to accede to the defendant's wishes regarding entry of a guilty plea, waiver of jury trial, and similar major decisions of constitutional importance, under the unique circumstances of this case, we do not find that Chapman's constitutional right to be the captain of his own ship was violated when the trial court exercised its discretion to appoint the attorneys Chapman had recently terminated.

## H. The Trial Court Did Not Err When it Refused to Consider the Mitigation Evidence Tendered by Standby Counsel.

■ Just hours before sentencing, Chapman's standby counsel delivered to chambers, under seal, a document that they asked the trial court to consider as mitigation evidence. During the sentencing hearing, the trial court mentioned that it had read the document and had considered it for purposes of determining Chapman's competency but that it had not considered its contents for mitigation purposes because Chapman himself did not want to present mitigation evidence. On review by this Court, Chapman contends that the trial court's refusal to consider the tendered mitigation evidence is contrary to KRS 532.025's requirement that a trial court "shall" consider mitigation evidence in death penalty cases.[29]

does not constitute an endorsement of the client's political, economic, social or moral views or activities.

28. *See, e.g., Baker v. Commonwealth,* 574 S.W.2d 325, 326–27 (Ky.App.1978) ("The expression 'counsel of one's own choice' drawn from the holding of the case in *Powell v. State of Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1931) does not mean that an indi-

gent defendant is entitled to the appointment of any particular attorney."); *see also* 21A Am.Jur.2d *Criminal Law* § 1248 (2007) ("Nor does a defendant have the right to standby counsel of his or her own choosing.").

29. *See* KRS 532.025(1)-(2)("(1)(a) Upon conviction of a defendant in cases where the death penalty may be imposed, a hearing

Chapman also contends that we should require amicus curiae to be appointed to present mitigation evidence in cases like this where a defendant does not want to present mitigation evidence.[30]

Unless the context of the statute requires a different interpretation, which KRS 532.025 does not, it is clear that the usage of the word "shall" in a statute denotes that something is mandatory.[31] And the presentation of mitigation evidence in a capital murder case is a matter of great importance.[32] So the trial court was obligated to consider any properly submitted mitigation evidence. But the document in question, a psychological report, was not properly submitted mitigation evidence.

Once the trial court allowed Chapman to proceed pro se, Chapman himself became the arbiter of what, if any, evidence he wanted to offer, including a right to waive his right to present mitigation evidence.[33] It is clear that a defendant may refuse to present mitigation evidence, even if his counsel advises him to the contrary.[34] And a pro se defendant proceeding with standby counsel has the right to determine what role, if any, standby counsel will perform.[35] In other words,

shall be conducted. In such hearing, the judge *shall* hear additional evidence in extenuation, mitigation, and aggravation of punishment[;] ... (2) In all cases of offenses for which the death penalty may be authorized, the judge *shall* consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law....") (emphasis added).

30. *See Hollaway v. State,* 116 Nev. 732, 6 P.3d 987, 998 (2000) (Rose, C.J., concurring) ("I conclude that because the State has a strong interest in protecting against arbitrary implementation of the death penalty, a representative should be appointed for sentencing to prevent such arbitrary imposition of the death penalty. This representative would act as an amicus curiae and investigate and present mitigating factors, thus fulfilling the aforementioned statutory directives that safeguard against random and arbitrary death sentences.").

31. *See* KRS 446.010(30) (" 'Shall' is mandatory....").

32. *Commonwealth v. Paisley,* 201 S.W.3d 34, 36 (Ky.2006) ("The establishment of mitigating circumstances at the penalty phase is of the greatest importance when a defendant is facing the death penalty." (*quoting Smith v. Commonwealth,* 734 S.W.2d 437, 456 (Ky. 1987) (Leibson, J., dissenting))).

33. *See Soto,* 139 S.W.3d at 855–56 ("The United States Supreme Court has yet to address this particular issue; however, many jurisdictions have upheld a defendant's right to voluntarily and intelligently waive the presentation of mitigating evidence. *E.g., United States v. Davis,* 285 F.3d 378, 381 (5th Cir. 2002), *cert. denied,* 537 U.S. 1066, 123 S.Ct. 618, 154 L.Ed.2d 555 (2002); *Singleton v. Lockhart,* 962 F.2d 1315, 1322 (8th Cir.1992); *Silagy v. Peters,* 905 F.2d 986, 1008 (7th Cir. 1990); *Nelson v. State,* 681 So.2d 252, 255 (Ala.Crim.App.1995); *People v. Bloom,* 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 715 (1989); *Hamblen v. State,* 527 So.2d 800, 804 (Fla.1988); *State v. Dunster,* 262 Neb. 329, 631 N.W.2d 879, 906 (2001); *Colwell v. State,* 112 Nev. 807, 919 P.2d 403, 406 (1996); *State v. Ashworth,* 85 Ohio St.3d 56, 706 N.E.2d 1231, 1236–37 (1999); *State v. Arguelles,* 63 P.3d 731, 753 (Utah 2003) ( [A] defendant's Sixth Amendment right to represent himself and control the course of the proceedings carries with it the right to choose how much—if any—mitigating evidence is offered." (internal quotation marks omitted))).

34. *St. Clair,* 140 S.W.3d at 560.

35. *See, e.g., Berry,* 184 S.W.3d at 64 ("We also recognize hybrid representation, or a defendant's ability to proceed *pro se* with standby counsel, *controlling counsel's role in the* litigation." (emphasis added)); *see also* 21A Am. Jur.2d *Criminal Law* § 1249 (2007) ("However, a pro se defendant is entitled to preserve actual control over the case he or she chooses to present to the jury, and if standby counsel's participation over the defendant's objection effectively allows counsel to make or substan-

once a defendant has validly waived his right to counsel and is proceeding pro se, standby counsel may not override that pro se defendant's wishes as to what evidence, if any, will be presented on behalf of the defense. After all, it is the defendant "who suffers the consequences if the defense fails." [36] This presupposes that the pro se defendant has been given all the warnings regarding the waiver of presentation of mitigation evidence set forth in *St. Clair*.[37]

In the case at hand, the trial court patiently engaged in a thorough colloquy with Chapman regarding mitigation evidence in general, as well as the specific

mitigation evidence which Chapman had the right to present. We reject Chapman's invitation to require the appointment of an amicus curiae to present mitigation evidence over a capital defendant's objection. And our holding comports with the views expressed by other states.[38] We find no suggestion that Chapman authorized standby counsel to tender the report allegedly containing mitigation evidence to the trial court. So standby counsel exceeded the scope of their authority by tendering the report to the trial court over Chapman's objection, meaning that the document was not properly before the court.

tially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, this right is eroded.... But if a defendant wishes standby counsel to be involved, to render impromptu advice, or even appear before the court, the defendant must authorize standby counsel to do so.").

**36.** *Faretta*, 422 U.S. at 820, 95 S.Ct. at 2533.

**37.** 140 S.W.3d at 560–61.

**38.** *See, e.g., Ashworth*, 706 N.E.2d at 1237–38 ("In our view, a rule requiring the presentation of mitigating evidence would be impossible to enforce. Even if the court attempted to require an attorney to present mitigating evidence, it cannot force an unwilling defendant to provide that evidence to his attorney."); *Hamblen v. State*, 527 So.2d 800, 804 (Fla. 1988) ("We hold that there was no error in not appointing counsel against Hamblen's wishes to seek out and to present mitigating evidence and to argue against the death sentence. The trial judge adequately fulfilled that function ·on his own, thereby protecting society's interests in seeing that the death penalty was not imposed improperly."); *People v. Bloom*, 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 718–19 (1989) ("A rule requiring a pro se defendant to present mitigating evidence would be unenforceable, as the court has no means to compel a defendant to put on an affirmative defense.... The

threat of appellate reversal would be not merely ineffective but counterproductive. A knowledgeable defendant desiring to avoid the death penalty could make a timely request for self-representation under *Faretta, supra,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, and then decline to present any mitigating evidence at the penalty phase, secure in the knowledge that any death judgment would be reversed by this court, while a defendant genuinely desiring death could circumvent the rule by presenting a bare minimum of mitigating evidence. A rule so easily evaded or misused is clearly unsound. The sanction of appellate reversal is not the answer, nor has any alternative method been suggested to compel an unwilling defendant to present an effective penalty defense."); *Wallace v. State,* 893 P.2d 504, 509 (Okla.Crim.App.1995); *see also* Richard J. Bonnie, *The Dignity of the Condemned,* 74 Va. L.Rev. 1363, 1368 (1988) ("Specifically, some argue that attorneys should ignore the wishes of clients who prefer execution so as not to frustrate the judicial obligation to assure that death sentences are valid before they are carried out. In its strongest version, this argument would obligate an attorney to defy his or her client's wishes by undertaking the litigation directly *or by requesting the court to appoint an amicus curiae to do so. Thus, this line of argument is fundamentally incompatible not only with traditional conceptions of an attorney's duty to respect the autonomy of a competent client, but also with prevailing preferences for judicial restraint."* (internal footnote omitted) (emphasis added)).

We also reject Chapman's argument that his waiver of mitigation evidence is rendered ineffective by our decision in *Soto v. Commonwealth.*[39] In *Soto*, we held that "the right to waive mitigating circumstances during the penalty phase of a trial is inherently different from the right to waive a defense inconsistent with a claim of innocence during the guilt phase."[40] In *Soto*, a defendant waived his right to present mitigation evidence involving an extreme emotional disturbance (EED) claim, yet his attorney asked in voir dire if the prospective jurors could consider EED as a mitigating factor. On appeal, Soto claimed that he was entitled to a new trial because his attorneys mentioned EED, despite his objections. On appeal, we rejected Soto's claims of error. *Soto*, however, is readily distinguishable and not controlling in the case at hand because, as we expressly pointed out, the defendant in *Soto* "never asserted his right to self-representation or expressed a desire to proceed *pro se.*"[41]

Likewise, Chapman's counsel's reliance on the recent decision of the United States Supreme Court in *Abdul–Kabir v. Quarterman*[42] is misplaced. In *Abdul–Kabir*, a death-sentenced petitioner contended in post-conviction proceedings that the trial court's jury instructions prevented the jury from meaningfully considering the mitigation evidence the petitioner had submitted.[43] The Supreme Court agreed and remanded the case for further proceedings. Obviously, the situation in *Abdul–Kabir* is vastly different from the case at hand in that Abdul–Kabir actually introduced mitigation evidence, yet the trial court's instructions prevented the jury from meaningfully considering that important evidence. Chapman, however, never sought to introduce mitigation evidence at all. So *Abdul–Kabir* is not controlling. Perhaps the mitigation evidence tendered by Chapman's counsel would have been beneficial in the trial court's difficult decision about whether to sentence Chapman to death. But the decision on whether to tender that evidence was Chapman's, not that of standby counsel. We will not compel a competent capital defendant to present mitigation evidence against that defendant's wishes. This view is in accordance with that expressed by other courts. For example, in *Ashworth*, the Ohio Supreme Court noted:

> Since Ashworth was competent to waive the presentation of mitigation, the only question remaining is whether, in spite of his waiver, there is some constitutional or statutory requirement that compels the presentation of mitigating evidence. In our view, a rule requiring the presentation of mitigating evidence would be impossible to enforce. Even if the court attempted to require an attorney to present mitigating evidence, it cannot force an unwilling defendant to provide that evidence to his attorney. In *Gray v. Lucas* (C.A.5, 1982), 677 F.2d 1086, the defendant steadfastly maintained that he did not want anyone to testify on his behalf and refused to identify any witnesses for the sentencing phase. The court said that the refusal did not ne-

---

**39.** 139 S.W.3d 827 (Ky.2004).

**40.** *Id.* at 857.

**41.** *Id.* at 856.

**42.** 550 U.S. 233, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007).

**43.** *Id.* at 127 S.Ct. 1659 ("Petitioner Jalil Abdul–Kabir, formerly known as Ted Calvin Cole, contends that there is a reasonable likelihood that the trial judge's instructions to the Texas jury that sentenced him to death prevented jurors from giving meaningful consideration to constitutionally relevant mitigating evidence." (footnote omitted)).

gate the attorney's duty to investigate, but added that 'the scope of that duty was limited by [the defendant's] refusal.' *Id.* at 1094. [*See also*] *Hamblen v. State* (Fla.1988), 527 So.2d 800, 804 ('There is no power that could have compelled [the defendant] to cooperate and divulge such information.').

Society does have an interest in executing only those who meet the statutory requirements and in not allowing the death penalty statute to be used as a means of state-assisted suicide. However, '[s]ociety's interest in the proper administration of justice is preserved by giving a defendant the right freely to present evidence in mitigation, by requiring the sentencing body to find aggravating factors before imposing the death penalty, and by requiring that a sentence of death be reviewed by this court. These practices are to assure that the death penalty will not be imposed arbitrarily.' *Hamblen,* 527 So.2d at 804, *quoting People v. Silagy* (1984), 101 Ill.2d 147, 181, 77 Ill.Dec. 792, 461 N.E.2d 415, 432.

Admittedly, the Eighth Amendment does impose a high requirement of reliability on the determination that death is the appropriate penalty in a particular case. *See, e.g., Johnson v. Mississippi* (1988), 486 U.S. 578, 584, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575, 584; *Mills v. Maryland* (1988), 486 U.S. 367, [383–84], 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384, 399. However, the United States Supreme Court has never suggested that this requires or justifies forcing an un-

willing defendant to accept representation or to present an affirmative penalty defense in a capital case.

'Indeed, the lack of any legal or practical means to force a [ ] defendant to present mitigating evidence, or indeed any defense at all, compels the conclusion that the death-verdict-reliability requirement cannot mean that a death verdict is unsound merely because the defendant did not present potentially mitigating evidence. Rather, the required reliability is attained when the prosecution has discharged its burden of proof at the trial and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute[.] A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements.' *People v. Bloom* (1989), 48 Cal.3d 1194, 1228, 259 Cal.Rptr. 669, 690, 774 P.2d 698, 719; *People v. Sanders* (1990), 51 Cal.3d 471, [525–26], 273 Cal.Rptr. 537, [569–70], 797 P.2d 561, [593–94].) [44]

Consequently, we find no error in the trial court's refusal to consider the improperly tendered mitigation evidence at hand.[45]

I. *The Commonwealth's Attorney's Alleged Plea Negotiations With Chapman While Chapman Was Represented by Counsel Do Not Compel Reversal.*[46]

◼ Chapman contends that the Commonwealth's Attorney violated our Rules

---

**44.** 706 N.E.2d at 1237–38.

**45.** *Cf. St. Clair,* 140 S.W.3d at 560 ("Although KRS 532.025 and KRS 532.055(2)(b) permit a defendant to introduce mitigating evidence, the defendant, is 'master of his own defense and pilot of the ship[,]' [*Jacobs v. Commonwealth,* 870 S.W.2d 412, 418 (Ky.1994) ], and thus may elect to ignore the advice of his

counsel and to waive the presentation of mitigating evidence."); *see also Wallace,* 893 P.2d 504 (holding that a defendant who sought to receive the death penalty had the right to refuse to present mitigation evidence).

**46.** Chapman admits this issue is unpreserved.

of Professional Conduct by negotiating a plea agreement with him at a time when he was still represented by counsel. Chapman is unable to cite to anything specific in the record to support this serious allegation. Instead, Chapman merely contends that the Commonwealth's Attorney must have had advance notice of Chapman's request to plead guilty by virtue of the fact that the Commonwealth's Attorney stated that she had recently spoken to Dr. Free and had determined that Dr. Free would be available to reevaluate Chapman. Chapman also inexplicably chastises the Commonwealth's Attorney for "outlin[ing] for the trial court the steps it needed to take to institute guilty plea proceedings[,]" and for quickly preparing for Chapman's signature a lengthy motion to enter a guilty plea.

■ We agree with Chapman that an attorney must not communicate directly about a pending case with a party the attorney knows is represented by counsel.[47] But Chapman has offered nothing concrete to show that the Commonwealth's Attorney had improper contact with him at a time when he was still represented by counsel. Speculation and innuendo are not proper bases for an appellate court to reverse a criminal conviction.

Furthermore, nothing inherently improper occurred when the Commonwealth's Attorney offered advice to the trial court about the procedures necessary to effectuate Chapman's guilty plea, nor did anything necessarily impermissible or unethical occur when the Commonwealth's Attorney prepared plea agreement docu-

ments before the trial court had formally accepted Chapman's plea.

We reject Chapman's argument to reverse this case based upon what is, at best, speculation regarding the Commonwealth's Attorney's alleged improper contact.

### J. Chapman Was Competent to Plead Guilty and Seek the Death Penalty.

Chapman contends that the competency standard for pleading guilty and seeking the death penalty is higher than that required of a typical defendant who wishes to plead guilty. And Chapman contends that the trial court erred by using a less rigorous standard of competency generally used to determine a defendant's competency to stand trial. So we must first determine what competency standard a trial court should use to determine whether a defendant is competent to seek to receive the death penalty, and we then must determine whether Chapman met that standard. In the course of answering those ultimate questions, however, it will be necessary for us to address several other related issues.

### 1. General Standards of Competency.

■ We begin with the unassailable proposition that a defendant found to be incompetent to stand trial may not be "tried, convicted or sentenced so long as the incompetency continues."[48] And the General Assembly has defined "incompetent to stand trial" to mean that a defendant is incompetent if, "as a result of mental condition, [the defendant lacks the] capacity to appreciate the nature and con-

---

47. *See* SCR 3.130(4.2) ("In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.").

48. KRS 504.090; *see also Godinez,* 509 U.S. at 396, 113 S.Ct. at 2685 ("A criminal defendant may not be tried unless he is competent.").

sequences of the proceedings against one or to participate rationally in one's own defense[.]"[49] Although it recognized that each state could adopt a more stringent standard, the United States Supreme Court has "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from)" the standard normally used to determine if a defendant is competent to stand trial.[50]

■ A competency determination is based on the preponderance of the evidence standard.[51] We may disturb a trial court's competency determination only if the trial court's decision is clearly erroneous (*i.e.*, not supported by substantial evidence).[52]

### 2. *The Trial Court Did Not Err In Finding Chapman Competent to Plead Guilty.*

■ Although recognizing Chapman's history of substance abuse and of suicidal thoughts, Dr. Free firmly and repeatedly testified that Chapman was competent. Thus, the trial court's conclusion that Chapman was competent to stand trial is supported by substantial evidence. Accordingly, we find that the trial court was not clearly erroneous when it held that

Chapman was competent to stand trial. We then must determine the correctness of the trial court's decision that Chapman was competent to plead guilty.

■ As stated previously, the United States Supreme Court has ruled that the same standard applies to a defendant's competency to stand trial and a defendant's competency to waive counsel and plead guilty. We find the following logic expressed by the Court to be especially convincing:

> *all* criminal defendants—not merely those who plead guilty—may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial. . . . This being so, we can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty. If the *Dusky* standard is adequate for defendants who plead not guilty, it is necessarily adequate for those who plead guilty.[53]

In addition, Kentucky precedent supports a conclusion that there is no heightened standard of competency required in order to enter a guilty plea.[54] Thus, we reject

---

**49.** KRS 504.060(4); *see also Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (holding that the test of competency is "whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (internal quotation marks omitted)).

**50.** *Godinez*, 509 U.S. at 398, 113 S.Ct. at 2686.

**51.** *Thompson*, 147 S.W.3d at 32.

**52.** *Id.* at 33 ("Little of this evidence places Appellant's competency in doubt and most of it supports the trial court's ultimate ruling that Appellant was competent to plead guilty. Thus, we conclude that the trial court's ruling was supported by substantial evidence and, therefore, was not clearly erroneous.") (*citing United States v. Branham*, 97 F.3d 835, 855 (6th Cir.1996), for the proposition that competency determinations are findings of fact).

**53.** *Godinez*, 509 U.S. at 398–99, 113 S.Ct. at 2686.

**54.** *Littlefield v. Commonwealth*, 554 S.W.2d 872, 873 (Ky.App.1977) ("Kentucky has

Chapman's contention that a defendant seeking to plead guilty to any offense must be held to a higher standard of competency than that generally required of a defendant to stand trial.

Since we have found that the trial court did not clearly err in finding Chapman competent to stand trial, it logically follows that the trial court did not err in finding Chapman competent to plead guilty. But that is not the end of our competency inquiry as we now turn to the heart of this case: Chapman's contention that a higher standard of competency is required for a defendant who wishes to plead guilty in order to seek the death penalty than would apply to a typical defendant who wishes to plead guilty in order to receive a lesser sentence. In order to resolve that question, however, we must first determine whether a defendant may ever plead guilty to a capital offense in order to seek the death penalty.

### 3. A Defendant May Plead Guilty to a Capital Offense In Order to Seek the Death Penalty.

 Chapman contends that a defendant who seeks to receive the death penalty is inherently incompetent. Chapman argues that we should adopt the Arkansas position that a defendant may not waive a jury trial on the issue of sentencing or guilt in a capital case[55] because a defendant who seeks to waive those constitutional protections and seeks his own execution simply has not voluntarily and intelligently[56] waived his rights.[57] We disagree.

As noted earlier, in Kentucky, the death penalty is a constitutionally permissible punishment for certain capital offenses. And there is certainly nothing inherently unconstitutional about a person deciding to take responsibility for his or her criminal misconduct without having first undergone a full-blown trial.[58] Adhering to a defen-

adopted the latter view, holding that competence to plead guilty and competence to stand trial are subject to the same strict standard."); *Thompson v. Commonwealth*, 56 S.W.3d 406, 408 (Ky.2001) ("Under Kentucky law, the competency to plead guilty and the competency to stand trial are identical.").

**55.** *See Newman v. State*, 353 Ark. 258, 106 S.W.3d 438, 456–57 (2003) ("Arkansas Rule of Criminal Procedure 31.4 prohibits a defendant charged with capital murder from waiving either a jury trial on the issue of guilt or the right to have his sentence determined by a jury unless (1) the court determines the waiver is voluntary and was made without compulsion or coercion, (2) the death penalty has been waived by the State, and (3) the State has assented to the defendant's waiver of his right to a jury trial, and such waiver has been approved by the trial court.").

**56.** *See Martinez*, 528 U.S. at 161, 120 S.Ct. at 691 ("As the *Faretta* opinion recognized, the right to self-representation is not absolute. The defendant must voluntarily and intelligently elect to conduct his own defense[.]") (internal quotation marks omitted).

**57.** *See State v. Shank*, 410 So.2d 232, 233 (La.1982) ("Moreover, a defendant's election to represent himself for the purpose of acquiescing in his conviction of a capital offense and in his death sentence cannot be sanctioned as an intelligent choice.").

**58.** *See* Barry J. Fisher, *Judicial Suicide or Constitutional Autonomy? A Capital Defendant's Right to Plead Guilty*, 65 Alb. L.Rev. 181 (2001) ("However, in reviewing the history of the capital guilty plea, Anglo–American law suggests that an across-the-board prohibition against capital guilty pleas violates the fundamental notion of due process. The right of an accused, even one facing the death penalty, to plead guilty unconditionally to the charges against him was explicitly recognized at common law. It has been widely and almost uniformly acknowledged and honored by state and federal courts since the Colonial period. Further, this right remains protected in the statutes and court decisions of all states but Arkansas, Louisiana, and New York." (footnotes omitted)); Bonnie, 74 Va. L.Rev. at 1376 ("A convicted prisoner does not become a pawn of the state. Even a prisoner sen-

dant's choice to seek the death penalty honors the last vestiges of personal dignity available to such a defendant.[59] Therefore, we hold that a competent criminal defendant is entitled to seek to plead guilty to a capital offense and, furthermore, to seek to receive the death penalty.[60] Thus, we reject Chapman's argument that the state's overriding interest in assuring that the death penalty is meted out in a constitutionally permissible manner invariably overrides a defendant's right to accept criminal responsibility for his past misconduct. The safeguards contained in this

opinion for a defendant who pleads guilty to a capital offense in order to seek the death penalty—such as ensuring that the defendant is competent, that a factual basis exists to support the imposition of the death penalty, and our proportionality review—amply protect the state's interests. Indeed, the rights of citizens of a free society to make these types of choices concerning their own future are essential to the proper functioning of society as a whole,[61] as well as our system of criminal justice.[62]

tenced to death retains a constitutionally protected sphere of autonomy—of belief, expression, and, to a limited extent, action. The state is bound to respect a convicted prisoner's inalienable freedom of conscience. He is free to admit his guilt and to repent, just as he is free to proclaim his innocence in defiance of the verdict under which he stands convicted. He is free to resign himself to the social decree, acknowledging the justice of the punishment, just as he is free to decry it.

A condemned prisoner may believe that the sentence of death is justly deserved and should be carried out, notwithstanding the existence of doubts about its validity. A condemned prisoner may prefer the unknowable fate of execution to the known pains of imprisonment, the only option likely to be available. As long as the prisoner is competent to make an informed and rational choice, the argument for respecting this choice would appear to be a powerful one.").

59. See Alex Kozinski, *Tinkering With Death*, The New Yorker, Feb. 10, 1997, at 48, 51 ("It has been said that capital punishment is cruel and unusual because it is degrading to human dignity.... But the dignity of human life comes not from mere existence, but from that ability which separates us from the beasts—the ability to choose; freedom of will When we say that a man—even a man who has committed a horrible crime—is not free to choose, we take away his dignity just as surely as we do when we kill him. Thomas Baal has made a decision to accept society's punishment and be done with it. By refusing to respect his decision, we denigrate his status as a human being.").

60. See e.g., *Lenhard v. Wolff*, 443 U.S. 1306, 1312–13, 100 S.Ct. 3, 61 L.Ed.2d 885 (Rehnquist, Circuit Justice 1979) ("The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever cost is the *summum bonum*, a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak."); *Smith v. State*, 686 N.E.2d 1264, 1271 (Ind. 1997) (holding that a defendant could enter into a plea agreement which called for the defendant to receive the death penalty); *State v. Brewer*, 170 Ariz. 486, 826 P.2d 783, 792 (1992) ("Defendant is not the first, and likely not the last, person to plead guilty in a death penalty case. We cannot say he is incompetent or prone to self-destructive impulses simply because he desires to do so." (internal footnote omitted)).

61. See, e.g., *Minnick v. Mississippi*, 498 U.S. 146, 167, 111 S.Ct. 486, 498, 112 L.Ed.2d 489 (1990) (Scalia, J., dissenting) ("While every person is entitled to stand silent, it is more virtuous for the wrongdoer to admit his offense and accept the punishment he deserves. Not only for society, but for the wrongdoer himself, 'admissio[n] of guilt ..., if not coerced, [is] inherently desirable,' because it advances the goals of both 'justice *and* rehabilitation'" (internal citations omitted)).

62. See, e.g., *United States v. Willis*, 75 F.Supp. 628, 630 (D.D.C.1948) ("The power of a court to accept a plea of guilty is traditional and

■ Furthermore, we decline to declare that a defendant may not waive his right to have a jury fix his sentence. Such a holding would appear to be in conflict with RCr 9.26,[63] as well as our previous recognition that a defendant has the concomitant right to waive a trial by jury.[64] We have not been cited to any authority that moves us to find that a defendant loses the right to waive jury sentencing simply because that defendant has pleaded guilty to a capital offense. So we decline Chapman's invitation to join the minority viewpoint found in Arkansas's ban on a defendant's right to waive jury sentencing in a case involving the death penalty.

4. *When a Defendant Pleads Guilty to a Capital Offense and Seeks the Death Penalty, the Trial Court is Not Required to Sentence the Defendant to Death.*

■ Although we have held that a defendant is entitled to enter into a plea agreement under which the defendant pleads guilty to a capital offense and seeks the death penalty, it is vital for the bench and bar of the Commonwealth to understand that our trial courts are not obligated to accept those plea agreements. And we must assure ourselves that the trial court in this case did not accept Chapman's plea agreement simply because it believed that it was obligated to do so.

Generally, the trial courts of the Commonwealth have the discretion either to accept or to reject plea agreements.[65] We

find no reason to depart from that standard in situations where the plea agreement calls for a defendant to receive the death penalty. Thus, a trial court may treat a plea agreement calling for imposition of the death penalty like other plea agreements—it must exercise discretion to determine whether the plea agreement will be accepted or rejected.

■ No trial court, including the one in the case at hand, is obligated to sentence a defendant to death simply because that sentence is called for in the plea agreement. Sentencing a defendant to death because the defendant volunteers to be executed is improper and is an abuse of discretion. Rather, an acceptance (or rejection) of a guilty plea is a decision that must be made on a case-by-case basis. Before accepting any plea agreement, a trial court must assure itself that the agreement is legally permissible and represents an appropriate resolution and punishment for the crime(s) to which the defendant seeks to plead guilty. Thus, a trial court abuses its discretion by automatically accepting or rejecting a guilty plea without first making the particularized and case-specific determinations that the plea is legally permissible and, considering all the underlying facts and circumstances, appropriate for the offense(s) in question.

■ We must examine the record to assure that the trial judge sentenced

---

fundamental. Its existence is necessary for the purpose of serving the practical ends of the administration of the criminal law.").

**63.** RCr 9.26(1) provides that "[c]ases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the Commonwealth."

**64.** *Marshall v. Commonwealth,* 60 S.W.3d 513, 522 (Ky.2001) ("It is now well settled that an accused, in the exercise of a voluntary and intelligent choice, may waive his right to a jury trial."); *see also* 28 Am.Jur.2d *Estoppel and Waiver* § 213 (2007) ("As a general proposition, rights guaranteed by the state or federal constitutions may be waived.").

**65.** *See Hoskins v. Maricle,* 150 S.W.3d 1, 20–24 (Ky.2004).

Chapman to death because the judge believed that death was an appropriate sentence for Chapman's crimes and not because the judge believed he was required mechanically to impose the sentence called for in the plea agreement.

We have some concerns here because the trial court commented at sentencing that since the death penalty was a constitutionally permissible punishment for Chapman's capital offenses and Chapman had decided to seek the death penalty of his own free will, then a decision to reject Chapman's plea agreement could be construed as an abuse of discretion. The trial court also generally commented to the effect that rejecting the plea agreement would, essentially, be a meaningless exercise because if it rejected the plea agreement, Chapman would simply refuse to present evidence and would personally ask the jury to sentence him to death.

Despite those concerns, we are satisfied that the trial court in this case did, in fact, sentence Chapman to death because the court believed that the death penalty was an appropriate punishment for Chapman, not simply because that was the punishment called for in Chapman's plea agreement. Our conclusion is based upon the fact that the trial court (1) informed Chapman of the entire range of punishment for his offenses (including punishments less than death); (2) informed Chapman of the consequences if it rejected Chapman's plea agreement (such as Chapman then having a right to withdraw his guilty plea); (3) engaged in several patient and thorough colloquies with Chapman in order to determine that Chapman was not incompetent

and was not seeking to plead guilty to expedite the proceedings against him for an improper or irrational reason (such as getting out of solitary confinement or getting away from being housed in the local jail); (4) found both orally and in writing that numerous statutory aggravating factors were present; and (5) wrote in the final judgment that it took into account the testimony of Dr. Free, Chapman's history and character, and the nature and circumstances of the crime, before sentencing Chapman to death. Thus, we find that the record demonstrates that the trial court sentenced Chapman to death based upon its careful consideration of the unique nature and circumstances of Chapman and his offenses.[66] So we conclude that Chapman was not sentenced to death merely because the trial court believed that the plea agreement precluded other sentencing options.

### 5. Chapman's Guilty Plea Was Not State–Assisted Suicide.

We reject Chapman's related contention that a defendant who pleads guilty in order to receive the death penalty is committing state-assisted suicide. As previously noted, any guilty plea in a capital case in which a defendant seeks to receive the death penalty must be closely scrutinized to ensure that it protects the constitutional rights of the defendant, as well as the Commonwealth's interest in ensuring that the death penalty is not used to further a defendant's suicidal motives. That scrutiny negates the possibility that a defendant is using the capital punishment

**66.** Cf. Abdul–Kabir, 550 U.S. at ——, 127 S.Ct. at 1674, 167 L.Ed.2d at —— ("Our line of cases in this area has long recognized that before a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense."). Presumably, a judge must consider the same factors before sentencing a defendant to death.

scheme as a method to commit suicide.[67] Thus, we refuse to issue a blanket holding that a competent defendant's plea of guilty in which he seeks a legally permissible sentence devolves into an unconstitutional plea because the sentence sought by the defendant is death.[68] And our review of the record in this case, as demonstrated in this opinion, shows that Chapman's plea was competently, knowingly, intelligently, and voluntarily made. Furthermore, the death penalty is not a disproportionate sentence for Chapman's heinous offenses. So Chapman's plea is not an impermissible "suicide by court."

### 6. *The Competency Standard to Be Used When a Defendant Seeks the Death Penalty.*

Having determined that it is generally permissible for a defendant to plead guilty to a capital offense in order to seek the death penalty and having determined that Chapman's plea is not state-assisted suicide, we now must determine whether the specific plea at issue in this case passes constitutional muster. In order to make that assessment, Chapman argues that we (and any court presiding over a case in which a defendant desires to plead guilty in order to seek the death penalty) are required to apply the heightened competency standard set forth by the United States Supreme Court in *Rees v. Peyton.*[69]

In *Rees,* a death-sentenced Rees sought habeas corpus relief, which was denied by the trial and appellate courts. Rees then consented to his attorney's filing a petition for certiorari, but he later asked his attorney to withdraw the certiorari petition. Rees was then subjected to psychiatric evaluations, after which one psychiatrist opined that he was incompetent, while other psychiatrists were unable conclusively to offer an opinion due to Rees's lack of cooperation. Those psychiatrists "expressed doubts" that Rees was "insane." [70]

Before deciding whether Rees's certiorari petition should be dismissed, the Supreme Court remanded the matter to the district court to issue a report concerning Rees's competence. The Supreme Court ordered the district court "to determine Rees'[s] mental competence in the present posture of things, that is, whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." [71]

---

67. *See, e.g., State v. Passaro,* 350 S.C. 499, 567 S.E.2d 862, 866 (2002) ("We disagree with appellate counsel's argument that allowing an individual to plead guilty to murder, be sentenced to death and waive his right to general appellate review is tantamount to State assisted suicide."); *Bloom,* 259 Cal.Rptr. 669, 774 P.2d at 715–16 ("Second, if the trier of penalty has determined death to be the appropriate punishment, and the death judgment meets constitutional standards of reliability, the judgment cannot reasonably be regarded as the defendant's doing (other than by his commission of the capital crimes) or its execution as suicide.").

68. Bonnie, 74 Va. L.Rev. at 1375 ("The prisoner's interest in controlling his own fate is often denigrated by proponents of aggressive judicial review as amounting to nothing more than 'state-administered suicide.' This is hyperbole, of course; *only if execution of a lawfully imposed death sentence amounts to homicide is the state an agent of suicide when it executes a competent prisoner who has declined to contest his death sentence.*" (internal footnotes omitted) (emphasis added)).

69. 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966).

70. *Rees,* 384 U.S. at 313, 86 S.Ct. at 1506.

71. *Id.* at 384 U.S. 314, 86 S.Ct. at 1506.

We agree that *Rees* is the standard of competency the trial courts of this Commonwealth must use when a defendant desires to plead guilty, waive jury sentencing and presentation of mitigation evidence, and asks the trial court to be sentenced to death. Although *Rees* involved the abandonment of post-conviction proceedings and Chapman's request is pretrial, this is essentially a distinction without a difference. Pursuant to a guilty plea, the standard would be "whether he has capacity to appreciate his position and make a rational choice with respect to [pleading guilty, waiving jury sentencing, waiving mitigating evidence, and seeking the death penalty] or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises"

7. *Applying the Rees Standard, the Trial Court Did Not Err When it Found Chapman Competent to Plead Guilty, Waive Mitigation Evidence and Jury Sentencing, and Seek the Death Penalty.*

In the case at hand, the trial court required Chapman to undergo evaluation at KCPC three times, including twice after Chapman expressed his desire to plead guilty and to seek death. The purpose of the first evaluation was to evaluate whether Chapman was competent to stand trial. Stewart H. Free, J.D., PhD., a licensed psychologist, prepared a twenty page report dated September 15, 2004, which explained the methodology used for evaluation and testing, and the results of each test that was administered. Dr. Free's extensive report concluded that:

The results of medical examination and psychological testing suggested that Mr. Chapman does not suffer from an organic impairment or brain damage. The results of the total evaluation at KCPC suggested that Mr. Chapman does not suffer from a thought disorder or psychotic dysfunction. Mr. Chapman was seen as suffering from Polysubstance Dependence, from a long-standing Dysthymic Disorder, and from symptoms of Post–Traumatic Stress Disorder. Mr. Chapman was believed to suffer from a Personality Disorder involving both Antisocial and Borderline Features. Mr. Chapman was seen as competent to stand trial and as lacking substantial grounds to argue an inability to bear criminal responsibility.

And,

Mr. Chapman appears to be in need of counseling to assist him to deal with his chronically depressed mood and his post-traumatic symptoms. Such services could and should be provided in the period prior to a disposition of his charges and thereafter.

The trial court found Chapman competent to stand trial and the parties readied for trial.

The focus changed when Chapman wrote and sent a four page letter to the trial court seeking to discharge his attorneys, plead guilty, and seek the death penalty. Competency was again brought to the forefront. The trial court sent Chapman back to KCPC for another evaluation. Dr. Free again conducted the evaluation and prepared a report dated October 20, 2004, and testified at a competency hearing on October 21, 2004.

Dr. Free incorporated his first report's findings and conclusions into a second report and made supplements thereto. Dr. Free knew the second evaluation was triggered by Chapman's request to discharge counsel, enter a plea of guilty, and to seek the death penalty. In this second evaluation, Chapman explored the opportunities available to him. Chapman explained his

tactics and articulated a logically thought out and thorough analysis of his situation, his options available, and his reasons for proceeding his way. He was coherent and under no delusions. Much of the first report was discussed. Dr. Free testified that he stood by his first report that Chapman has depression and his insight is impaired somewhat as a result, but overall, he is competent to stand trial, and to proceed as he wishes. Although Dr. Free was not aware of a different competency standard to stand trial than to discharge counsel, plead guilty and seek death, his report concluded that:

> Psychological testing during his prior KCPC stay, and collateral information about previous testing elsewhere suggested that Mr. Chapman is not mentally retarded. The results of psychological testing and medical examination suggested that Mr. Chapman does not suffer from an organic impairment or brain damage. The results of the total evaluation at KCPC suggested that Mr. Chapman does not suffer from a thought disorder or psychosis. There was nothing in Mr. Chapman's presentation, responses, or testing results today to change those conclusions. Mr. Chapman appears to have a rational understanding of his legal situation, and a settled plan for the disposition of his charges that is consistent with the legal process that must be followed.

Dr. Free acknowledged that Chapman's decision to plead guilty was colored by his history of depressed mood and his situation, but believed he was competent to make the decision. The trial court inquired of Dr. Free whether Chapman's chronically depressed mood would affect his ability to choose the outcome of his case, or to be the "master of his own ship." Dr. Free opined that an individual could have a depression of such a quality, but that it did not appear to him that Chap-

man's depressed mood rose to that level. When asked by the trial court if Chapman were to be treated for his depression, whether or not Chapman would change his mind about pleading guilty and seeking the death penalty, Dr. Free stated that it was possible.

While neither the court nor counsel appeared aware of *Rees*, the trial court recognized that there must be a higher standard of competency for an individual that wants to discharge counsel, enter a plea, and seek the death penalty, than the standard of competency to stand trial. After extensive questioning of Chapman, and even after twice advising Chapman to follow his attorney's advice, the trial court ordered Chapman back to KCPC for further treatment for his depression for a period of thirty days, or as needed, for treatment of Chapman's depression, and for further testing. Chapman was admitted to KCPC on October 28, and discharged on December 5, 2004.

On December 7, the trial court continued the competency hearing started on October 21. The court reexamined Dr. Free and Chapman. Dr. Free testified that on November 2, Chapman was prescribed Zoloft and continues on this medication to treat his depression. Dr. Free opined the effects of Zoloft should be felt within a few days to a few weeks, but patients are generally told two to four weeks. Dr. Free opined that Chapman's depression could not be cured in thirty days; that Chapman still has depression, but that it does not affect his legal competency. Chapman expressed his desire to the trial court that he still wanted to proceed by firing his counsel, enter a guilty plea, waive jury sentencing, and request the death penalty. After both sides were permitted to question Dr. Free, the trial court found:

1) The Court finds there is no evidence of any mental condition present in the Defendant that would impair the Defendant's ability or show a lack of capacity to appreciate his legal situation.

2) The Court does not find any evidence of a medical condition present in the Defendant that would impair the Defendant or show a lack of capacity to understand the nature and consequences of the proceedings against him.

3) The Court does not find any evidence of a mental condition present in the Defendant that would impair his ability or show a lack of ability to participate rationally in his own defense.

4) The Court finds the Defendant, Marco Allen Chapman, competent to stand trial and competent to participate in these proceedings against him.

5) The Court finds that the Defendant's letter of October 13, 2004 entitled "Guilty Plea" was written solely by Mr. Chapman, and that the document was knowingly, intelligently and voluntarily prepared by the Defendant.

6) The Defendant is competent to choose to fire his Attorneys.

7) The Defendant is competent to represent himself.

8) The Defendant, Chapman's eyes are wide open to the consequences of his choices.

9) The Defendant's assertion to his right of self-representation is knowingly, intelligently and voluntarily made.

10) The Defendant understands the dangers and disadvantages of self-representation.

11) The Defendant has knowingly and voluntarily waived his right to counsel.

We opine that the trial court's findings are wholly consistent with the Rees standard, and do show that Chapman had the capacity to appreciate his position and make a rational choice with respect to pleading guilty, waiving jury sentencing, waiving mitigating evidence, and seeking the death penalty, or on the other hand, that Chapman was not suffering from a mental disease, disorder or defect which may substantially affect his capacity in the premises. Also, the trial court's decision is not clearly erroneous because it is supported by substantial evidence in the form of Dr. Free's testimony and the trial court's colloquies with Chapman. Accordingly, we affirm the trial court's conclusion that Chapman was competent to plead guilty in order to seek the death penalty.

### 8. *Factual Basis for Plea.*

As a final contention that his guilty plea must be reversed, Chapman argues that the trial court did not sufficiently assure itself that a factual basis existed for the plea.

During the trial court's several meticulous colloquies with Chapman, the trial court informed him of his rights and repeatedly asked him if he was aware of his rights and was sure that he wanted to waive them. The trial court went through possible mitigation evidence available to Chapman, including his history of physical and substance abuse. In fact, the trial court repeatedly took the extraordinary step of telling Chapman that it disagreed with his decision to fire his attorneys and to plead guilty in order to receive the death penalty.

We reject Chapman's contention that his guilty plea was invalidated by the fact that the trial court did not require him personally to recite the factual basis for his guilty plea. Chapman has cited to no binding authority requiring a trial court to obtain a factual basis underlying a guilty plea by requiring a defendant personally to recite

the factual basis for a guilty plea.[72] In fact, the rule appears to be that a trial court can satisfy itself that there is a factual basis for a guilty plea in any number of ways,[73] many of which do not involve a defendant personally reciting his involvement in the underlying facts which gave rise to the criminal charges.[74] Even *Santobello* principally relied upon by Chapman, does not absolutely require a defendant personally to recite the factual basis underlying his guilty plea. Rather, *Santobello* only provides that one method of acquiring a factual basis underlying a guilty plea is from a recitation by a defendant. Indeed, it has been held that the requirement for a factual basis is satisfied in cases that do not involve unduly complicated crimes if a summary of the charges is read to the defendant and the defendant admits to having committed the offense.[75]

In this case, the trial court carefully recited the charges against Chapman and asked him if he committed those offenses. Chapman answered in the affirmative. Although Chapman later claimed not to recall portions of the events that gave rise to

the charges against him, the record documents the discussion between Chapman and the West Virginia authorities in which Chapman set forth in greater detail the particulars of his crimes.

■ Even assuming for argument that a trial court errs by not ascertaining the factual basis underlying a guilty plea before accepting that plea, we do not hold that a trial court must invariably obtain that factual basis by asking a defendant to give a statement in which he recites his involvement in the crime(s) to which he seeks to plead guilty. Since the record contains ample evidence from which the trial court could have ascertained the factual basis underlying Chapman's guilty plea, we reject Chapman's argument that reversible error occurred when the trial court failed to require him to recite at length his involvement in the offenses at issue.

### K. *Cumulative Error.*

Finally, Chapman contends that his convictions and sentence must be reversed

72. Federal Rules of Criminal Procedure 11(b)(3) provides that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Notably, Kentucky Rules of Criminal Procedure (RCr) 8.08, which governs pleas, does not expressly contain that requirement that a trial court ascertain a factual basis before accepting a guilty plea.

73. *Santobello v. New York,* 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) ("Fed.Rule Crim.Proc. 11, governing pleas in federal courts, now makes clear that the sentencing judge must develop, on the record, the factual basis for the plea, as, *for example,* by having the accused describe the conduct that gave rise to the charge." (emphasis added)).

74. *See, e.g., United States v. Tunning,* 69 F.3d 107, 112 (6th Cir.1995) ("The ideal means to establish the factual basis for a guilty plea is for the district court to ask the defendant to state, in the defendant's own words, what the

defendant did that he believes constitutes the crime to which he is pleading guilty.... This ideal method is by no means the only method, however. We recognize that the district court may determine the existence of the [Federal Rule of Criminal Procedure] Rule 11(f) factual basis from a number of sources, including a statement on the record from the government prosecutors as well as a statement from the defendant." (citing *United States v. Goldberg,* 862 F.2d 101, 105 (6th Cir.1988)) (internal quotation marks omitted)); *see also* 21 Am.Jur.2d *Criminal Law* § 715 (2007).

75. *See, e.g., United States v. Van Buren,* 804 F.2d 888, 892 (6th Cir.1986) ("Where the crime is easily understood, several courts have held that a reading of the indictment, or even a summary of the charges in the indictment and an admission by the defendant, is sufficient to establish a factual basis under Rule 11.").

under the cumulative error doctrine by which multiple harmless errors can be deemed to have the same deleterious effect as one prejudicial error. However, since we have found no errors, the cumulative error doctrine is inapplicable.[76]

## V. *CONCLUSION.*

For the foregoing reasons, Marco Allen Chapman's convictions and sentence are affirmed.

All sitting. LAMBERT, C.J.; CUNNINGHAM, MINTON, NOBLE, SCHRODER, and SCOTT, JJ., concur.

LAMBERT, C.J., also concurs by separate opinion in which NOBLE, J., joins.

Concurring Opinion by Chief Justice LAMBERT.

While I concur with the result of the majority opinion, I write separately to emphasize that Chapman's volunteerism with respect to the death penalty plays no part in my concurrence.

Imposition of the death penalty is the ultimate expression of state outrage for criminal conduct. The wishes of a defendant, whether motivated by sincere remorse, desire to escape life imprisonment, or to assert control, should play no part in a death penalty determination. The death penalty should be imposed only at the conclusion of the litigation process, after every possible legal claim available to the defendant has been explored and determined to be without merit.

NOBLE, J., joins this concurring opinion.

**76.** *See, e.g., Welborn v. Commonwealth,* 157 S.W.3d 608, 615 (Ky.2005).